[No. B166003. Second Dist., Div. Three. Aug. 27, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JENSEN IAN RAMOS, Defendant and Appellant.

**COUNSEL**

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Jensen Ian Ramos appeals the judgment entered after conviction by jury of four counts of attempted willful, deliberate and premeditated murder and one count of shooting at an occupied motor vehicle. (Pen. Code,

§§ 664, 187 & 246.)[1] The jury found Ramos personally used a firearm in the commission of each offense and that each offense had been committed for the benefit of a criminal street gang. (§§ 12022.53, subd. (b), 186.22, subd. (b).) The trial court sentenced Ramos to a lengthy prison term.

## SUMMARY STATEMENT

We reject Ramos's claims that (1) his confession should have been excluded from evidence as the product of an improper promise of leniency, (2) the trial court erroneously excluded expert testimony on police interrogation techniques, and (3) the evidence does not support the convictions. However, we agree the trial court committed various sentencing errors. Accordingly, we affirm the underlying convictions but remand the matter for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Prosecution's evidence.*

On January 4, 2002, Ryan Quintos drove three friends to a party being held in the backyard of a house in the City of Walnut. At approximately 10:00 p.m., numerous individuals, including Quintos and his friends, were in the front yard of the house because they had not paid the fee to enter the backyard. One of Quintos's friends got into a fight and Quintos heard someone say, "he's strapped" or "he's got a gun." Quintos and his companions ran to Quintos's black Acura Integra.

Laurie Sian, a friend of the host, was in the backyard when she heard people yelling there was a fight in the front yard. Sian tried to keep the partygoers in the backyard but people in the front yard called to their friends in the backyard to join them. When Sian attempted to stop Ramos from leaving the backyard, Sian saw that Ramos had a handgun in his waistband. Shortly thereafter, Sian heard numerous gunshots.

As the Integra drove from the scene, Ryan Reyes, one of the passengers in the Integra, saw Ramos standing on the sidewalk in front of the house. Ramos ran toward the Integra, produced a handgun from his waistband and fired. Reyes saw a few flashes, then ducked and heard metal objects striking the Integra as it drove away. The right rear tire of the Integra went flat a short distance from the party but Quintos continued to drive on the rim because he thought they were being followed. There were bullet holes in the back of the Integra and a bullet fragment was later found in the lid of the trunk.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Investigators found 11 spent casings at the scene of the shooting. A criminalist opined the casings had been discharged from three different weapons.

Sian and Reyes identified Ramos in a photographic lineup and at trial. Reyes also identified Ramos at a live lineup.

Ramos also was identified at trial by Thomas Aihama, Ramos's former best friend and fellow gang member. Aihama testified that, after one of their friends was knocked down by a member of a rival gang, Ramos and an individual known as Smokey shot at a black Integra as it drove from the party. Aihama admitted he had been convicted of burglary and possession of a firearm, he had abused methamphetamine for approximately four years, and he had been granted probation on a pending charge of possession for sale of methamphetamine in exchange for his truthful testimony in Ramos's case. Aihama testified he took the blame for Ramos in the firearm case and Ramos gave him the methamphetamine he possessed in his current case. Aihama has been threatened by members of his own gang not to testify against Ramos.

Sheriff's Detective Marc Verlich interviewed Aihama and Ramos separately on April 3, 2002, at the Walnut Sheriff's station. Aihama told Verlich that he and his friends parked their cars some distance from the party so they could return to their vehicles and leave without being seen by witnesses if anything happened at the party.

As a result of Verlich's interview of Ramos, the details of which are set forth in the Discussion, *post*, Ramos wrote a statement in which he admitted one of his friends was jumped at the party by rival gang members and, as the rival gang members left the scene in a black Intega, Ramos aimed a handgun at the Integra and pulled the trigger but the gun did not fire. Ramos later discovered the firing pin was missing from the weapon. Ramos confirmed the contents of the written statement in a videotaped interview that was played for the jury. Ramos said he had a handgun on the night in question to "protect the homeboys" and that "he would lay down his life for his fellow gang members."

Verlich testified as an expert on criminal street gangs and expressed the opinion these crimes had been committed for the benefit of Ramos's gang.

### 2. *Defense evidence.*

The defense called witnesses who testified Aihama could not have observed the shooting because he was around the corner where he and his friends had parked their cars at the time the shots were fired. Defense

witnesses also testified Aihama was a drug addict and a liar who had admitted that he was going to testify falsely against Ramos to ensure a beneficial deal on his own case for possession of methamphetamine.

The defense also presented the testimony of an expert on eyewitness identification, an expert on the effect of methamphetamine abuse and an expert on gangs.

## DISCUSSION

1. *Ramos's confession to Verlich was voluntary.*

  a. *Evidence presented at the hearing on the motion to exclude the confession.*

At a pretrial hearing on a motion to suppress Ramos's oral, written, and videotaped statements of April 3, 2002, Verlich testified that after Ramos waived his rights per *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], Ramos admitted he was at the party but said members of another gang had been responsible for the shooting. This interview lasted five or seven minutes.

Verlich then interviewed Aihama, who was in custody in another interview room on the possession for sale of methamphetamine charge. Verlich obtained information from Aihama that implicated Ramos in the shooting. Verlich then returned to Ramos's interview room and confronted Ramos with the information. Verlich explained to Ramos "that, by his cooperation and assistance in identifying the other people involved in the shooting, that it would benefit [Ramos] in the judicial process because [Verlich] would bring . . . [Ramos's] statements to the district attorney's office for consideration." Verlich testified he told Ramos "the district attorney could review the facts of the case for any considerations. [¶] I never made him any promises about the case or [offered] any leniency . . . . I just told him I could present the facts to the district attorney on his behalf." At that point, Ramos dropped his head into his hands, appeared to struggle with his conscience and changed his statement. Verlich then asked Ramos to write a statement and left the room. This portion of the interview lasted approximately 15 minutes.

While Verlich was absent from the interview room, Ramos wrote that he had pointed a .25-caliber automatic handgun in the direction of the Integra and pulled the trigger but the gun did not fire. At the suggestion of his sergeant, Verlich conducted a videotaped interview with Ramos in which Ramos confirmed the contents of the written statement. This portion of the interview took approximately 15 minutes.

Ramos also testified at the hearing on the motion to suppress. Ramos claimed Verlich promised he would serve no more than one year in the county jail if he made a written statement, threatened he would serve life in prison if he did not make a statement and ignored Ramos's repeated requests to speak with an attorney.

b. *The trial court's ruling.*

The trial court rejected Ramos's "entire testimony" as lacking credibility. The trial court concluded that although the interview was conducted at the police station, it was not "excessively lengthy" and Verlich interrupted the interview to speak to Aihama. Also, Ramos was a college student, and there was no indication he had any mental defect or disease. The trial court also found Verlich's reference to the "judicial process" was "vague" and indicated the cases did not require exclusion of a statement whenever a police officer mentions there may be some "benefit one way or the other." The trial court noted Verlich's advice in this case, that Ramos's cooperation might help in the judicial process, was accurate because an early admission of guilt is a factor in mitigation, which could result in the imposition of concurrent rather than consecutive terms.

The trial court concluded, "I don't feel the officer's conduct rises to a level of coercion as prohibited by the cases. I don't think that the officer's statement gave rise to the level of either a direct or implied promise." The trial court found Verlich's statements to Ramos were consistent with an attempt to locate the outstanding suspects in the shooting and stated its belief that, had Ramos identified other shooters, Verlich would have included that information in his report. Based on all these factors, the trial court denied the motion to suppress.

c. *Law related to the voluntariness of a statement by an accused.*

Before a defendant's statement may be admitted into evidence, the prosecution has the burden of proving by a preponderance of the evidence that the statement was voluntary. (*People v. Sapp* (2003) 31 Cal.4th 240, 267 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].)

A statement is involuntary and, thus, inadmissible, if it is obtained by threats or promises of leniency, whether express or implied, however slight, or by the exertion of any improper influence. (See *People v. Clark* (1993) 5 Cal.4th 950, 988 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People v. Benson*

(1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330]; *People v. Jimenez* (1978) 21 Cal.3d 595, 611 [147 Cal.Rptr. 172, 580 P.2d 672], overruled on another ground by *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

"The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. . . . [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper . . . . On the other hand, if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." (*People v. Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]; see *People v. Howard* (1988) 44 Cal.3d 375, 398 [243 Cal.Rptr. 842, 749 P.2d 279]; *People v. Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].)

" 'Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " [Citation.] On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.]' " (*People v. Boyette* (2002) 29 Cal.4th 381, 411 [127 Cal.Rptr.2d 544, 58 P.3d 391]; see *People v. Williams* (1997) 16 Cal.4th 635, 659–660 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Benson, supra,* 52 Cal.3d at p. 779.)

### d. *The record does not support Ramos's claim.*

Applying the totality of the circumstances test to the facts presented here, we agree with the trial court's finding that Ramos's confession was not involuntary. Indeed, none of the factors cited above to be considered when determining the voluntariness of a confession suggest Ramos's confession was involuntary. There was no evidence of coercion by Verlich, the interrogation did not continue over an extended period of time, it was interrupted by

Verlich's interview of Aihama, Verlich did not deceive Ramos regarding the strength of the evidence against him, Verlich was not present when Ramos wrote the incriminating statement and Ramos confirmed the contents of the written statement in a videotaped interview which the jury saw during trial. Although Ramos was youthful, he attended college and thus was not immature or uneducated, and there is no suggestion his physical condition or mental health was compromised.

In sum, this case is unlike the cases relied upon by Ramos in which the record contained evidence of overreaching, misrepresentation, badgering, coercion or a course of conduct on the part of the interrogator designed to break the will of the accused. (See, e.g., *People v. Neal* (2003) 31 Cal.4th 63, 81–85 [1 Cal.Rptr.3d 650, 72 P.3d 280] [investigators made threats and promises and deliberately violated the *Miranda* rights of an immature and uneducated defendant who was held incommunicado and without food for more than 24 hours]; *People v. Hogan, supra*, 31 Cal.3d at pp. 838–843 [interrogators made promises of leniency, engaged in psychological coercion and falsely told the defendant he had been seen committing the charged offenses]; *People v. Jiminez, supra*, 21 Cal.3d 595, 607 [investigator told the defendant he could get the death penalty if he did not admit the offense but a codefendant, the actual killer, probably would not get the death penalty]; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 213–216 [24 Cal.Rptr.2d 395] [the interrogating officer repeatedly told the suspect, falsely, that witnesses would identify him, that a truthful statement would benefit the suspect's girlfriend and that the suspect would not be tried as an adult if he confessed].)

Given that all of the relevant factors in this case are resolved in favor of admission of the confession, the entire thrust of Ramos's argument on appeal relies on his assertion Verlich made an improper promise of leniency by advising Ramos that his cooperation in the investigation would benefit Ramos during the judicial process. Although the indication Ramos would benefit in the judicial process, without more, might be viewed as a promise of leniency, express or implied, however slight, we do not consider the words spoken in a vacuum but in the context of the conversation.

Verlich testified the statement regarding benefit in the judicial process immediately was qualified by the further admonition that Verlich would advise the district attorney of Ramos's level of cooperation, but the district attorney would determine what consideration Ramos would receive in return for his cooperation. Thus, Verlich's "offers of intercession with the district attorney amounted to truthful implications that [Ramos's] cooperation might be useful in later plea bargain negotiations. [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 298 [70 Cal.Rptr.2d 793, 949 P.2d 890]; see *People v. Boyde* (1988) 46 Cal.3d 212, 239 [250 Cal.Rptr. 83, 758 P.2d 25] [no implied

promise of leniency when a detective informed the defendant he could only pass information to the district attorney]; *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409 [29 Cal.Rptr.2d 763] [no promise of leniency where an investigator offered to talk to the district attorney if the defendant told the truth and that it was up to the district attorney to take further action].) Because Verlich only pointed out the benefit that might naturally flow from a truthful and honest course of conduct, Verlich's remarks did not constitute a promise of leniency.

Ramos's assertion to the contrary relies on a version of Verlich's remarks to Ramos found in Verlich's police report, which defense counsel brought out on cross-examination, that did not include reference to the district attorney's involvement.[2] However, on appeal, we credit the facts as found by the trial court. Here, the trial court found Verlich's testimony at the hearing on the motion to suppress was credible. Thus, the trial court accepted Verlich's testimony regarding the circumstances of the interview that showed no improper promise of leniency had been made and that Verlich promised only to present evidence of Ramos's cooperation to the district attorney. Accordingly, the fact Verlich's police report contained a statement that might be construed as an implied promise of leniency does not affect the result in this case.

■ In sum, based on the totality of the circumstances presented, we conclude Ramos's statement was voluntary and admissible at trial to prove his commission of the charged offenses.

### 2. *The trial court's exclusion of expert testimony on police interrogation tactics does not require reversal.*

The defense sought to call Richard Leo, Ph.D., as an expert on police interrogation techniques and false confessions. The trial court sustained the prosecutor's objection to the testimony and ruled, "Any opinion rendered by [Dr.] Leo would be pure speculation based on items that are not presently in the record. . . . [¶] . . . [T]here is absolutely not a shred of evidence before us at this point to render a basis . . . for any opinion by Dr. Leo that the confession was false." The trial court indicated it would revisit its ruling if the defense presented other evidence suggesting the confession was false.

Defense counsel renewed the request the next day and filed a written objection to the trial court's ruling. In that objection, defense counsel noted Ramos's mother would testify Verlich twice in her presence made promises

---

[2] On cross-examination, Verlich conceded that his police report indicates, "I told [Ramos] that his cooperation with the investigation as well as his accepting responsibility for what he had done in showing remorse for the victims would benefit him during the judicial process."

of leniency to Ramos and that one of Ramos's associates would testify Verlich wanted to send Ramos a message he would go to prison for life if he did not give Verlich the evidence he wanted. The trial court again sustained the People's objection finding Leo's testimony would "be raw speculation."

On appeal, Ramos contends the trial court erroneously excluded Leo's expert testimony. Ramos argues that, like expert testimony explaining psychological factors involved in the accuracy of the eyewitness identifications (*People v. McDonald* (1984) 37 Cal.3d 351, 367–369 [208 Cal.Rptr. 236, 690 P.2d 709], overruled on another ground by *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265]), or expert testimony that helps dispel the common perception that a battered woman is free to leave an abusive relationship (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1087–1089 [56 Cal.Rptr.2d 142, 921 P.2d 1]), evidence that certain police interrogation techniques have a tendency to produce unreliable acknowledgments of guilt would have served to refute the commonly held notion that people do not confess to crimes they did not commit (*People v. Page* (1991) 2 Cal.App.4th 161, 181–183 [2 Cal.Rptr.2d 898]).

Ramos notes the United States Supreme Court has recognized "a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." (*Crane v. Kentucky* (1986) 476 U.S. 683, 689 [90 L.Ed.2d 636, 106 S.Ct. 2142].) Ramos argues Leo's testimony "would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." (*U.S. v. Hall* (7th Cir. 1996) 93 F.3d 1337, 1345.) Ramos concludes the exclusion of Leo's testimony requires reversal.

We are not persuaded. A trial court has broad discretion in determining whether to admit expert testimony and its ruling will be reversed on appeal only where the record reveals an abuse of discretion. (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1083–1084 [112 Cal.Rptr.2d 479]; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506 [68 Cal.Rptr.2d 135].) We find no abuse of the trial court's discretion in this case.

*Crane v. Kentucky*, *supra*, 476 U.S. at p. 691 is the seminal case in this area. In *Crane*, a 16-year-old defendant testified at a pretrial motion to suppress that he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession. In opening statement, defense counsel told the jury the defense would present evidence regarding the length of the interrogation and the manner in which it had been conducted to demonstrate the

statement was unworthy of belief. Prior to the presentation of any evidence, the trial court sustained the prosecutor's objection to the admission of evidence related to the circumstances of the confession. The trial court ruled the defense could inquire into inconsistencies in the confession but could not present any evidence about the duration of the interrogation or the individuals in attendance on the ground such evidence was relevant only to the issue of voluntariness, which was not before the jury.

Crane held the reliability of a confession and its voluntariness are two separate questions, reliability being a factual issue for the jury and voluntariness being a legal issue for the court. Crane concluded the "blanket exclusion" of evidence related to the circumstances of the confession deprived the accused of a fair opportunity to present a defense. (Crane v. Kentucky, supra, 476 U.S. at p. 690.)

We agree with the principles underlying Crane but find the trial court made no similar blanket exclusion in this case. Rather, the record reveals defense counsel cross-examined Verlich extensively regarding his interrogation techniques used in the interview of Ramos as well as the interrogation techniques used in his questioning of other witnesses. Defense counsel also called witnesses who testified Verlich threatened them and attempted to coerce statements from them and from Ramos. The jury also was aware of the circumstances of the interrogation based on the videotape of Ramos's statement. Thus, this is not a case like Crane where the defense was not permitted to attack the reliability of the defendant's statement.

Ramos also relies on People v. Page, supra, 2 Cal.App.4th 161, a case in which an expert on police interrogation was permitted to testify generally about factors that might lead to a false confession but was not permitted to relate those factors to the defendant's statement or to render an opinion concerning its reliability. Specifically, the expert was not permitted to testify that certain characteristics of the interrogation suggested the confession was unreliable. Page found no improper restriction on the expert testimony and noted the defense expert had "outlined the factors which might influence a person to give a false statement or confession during an interrogation. Having been educated concerning those factors, the jurors were as qualified as the professor to determine if those factors played a role in [the defendant's] confession, and whether, given those factors, his confession was false." (Id. at p. 189.)

Page does not assist Ramos. The interrogation in that case was substantially more complex than the questioning of Ramos in that it included a polygraph examination and the interrogators lied to the defendant. Also, the defendant in Page took the witness stand at trial and testified regarding the

circumstances and the length of the repeated interrogations that led to his confession as well as the circumstances surrounding its subsequent recantation. The defendant testified the false statements made by the police caused him to question his own perception of reality. Thus, the expert testimony in *Page* was responsive to the defense claim that the circumstances of the interrogation, which included inaccurate information from an authority figure, can cause an individual under stress to feel guilty and vulnerable to suggestion.

■ This case, on the other hand, did not involve similar facts. Verlich did not misrepresent the state of the evidence to Ramos, did not subject him to a polygraph examination and did not question him repeatedly over an extended period of time. Thus, as the trial court concluded, the defense failed to demonstrate the need for Leo's expert testimony. Moreover, the trial court expressly indicated its ruling was tentative and that it would revisit the issue if the evidence adduced at trial suggested Leo's expert testimony was relevant. Because the jury could understand and evaluate all the evidence presented at Ramos's trial without the assistance of an expert on police interrogation, we find no abuse of discretion in the trial court's order excluding Leo's testimony.

3. *Substantial evidence supported the convictions.*

Ramos contends the People's evidence failed to establish that Ramos had the necessary intent to kill, let alone a willful, deliberate and premeditated intent to kill, the four occupants of the Integra.

■ We review claims of insufficient evidence by evaluating the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value from which a rational trier of fact could have found the essential elements beyond a reasonable doubt. (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Price* (1991) 1 Cal.4th 324, 462 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) The credibility of witnesses and the weight accorded the evidence are matters within the province of the trier of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Stewart* (2000) 77 Cal.App.4th 785, 790 [91 Cal.Rptr.2d 888].)

■ Attempted murder requires the intent to kill plus a direct but ineffectual act toward its commission. (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) Generally, the question whether the defendant

harbored the required intent must be inferred from the circumstances of the shooting. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946 [2 Cal.Rptr.2d 629].)

Here, Ramos, an admitted gang member, and numerous gang companions armed themselves before attending a party. They parked around the corner so as not to be identified when they left in the event anything happened at the party. Both of these circumstances demonstrated planning and a preconceived willingness to take immediate lethal action should the need arise. (See *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 [113 Cal.Rptr.2d 1].) Additionally, the People's gang expert testified gang members are expected to defend each other and shoot anyone who disrespected a fellow member of the gang.

Consistent with this planning activity and the expert gang testimony, Ramos ran to the front yard when he heard one of his companions had been involved in a fight. Once there, Ramos produced a handgun and aimed it at the Integra. According to Ramos's own account of the incident, he pulled the trigger of the weapon but it failed to fire. Because the evidence suggested Ramos believed the occupants of the Integra were rival gang members, there was also evidence of motive for the attempted murder.

■ From this evidence, a reasonable trier of fact properly could conclude Ramos harbored the intent to kill. Based on these same factors, the jury also properly could conclude the attempted murder had been willful, deliberate and premeditated. As noted, there was evidence of planning and motive and the manner of the attempted murder, firing numerous rounds at an occupied vehicle, showed the shooting was purposeful. Thus, there was sufficient evidence to support the finding the attempted murders committed by Ramos were willful, deliberate and premeditated. (*People v. Perez* (1992) 2 Cal.4th 1117, 1127 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942].)

### 4. *The matter must be remanded for resentencing.*

For the attempted willful, deliberate and premeditated murder charged in count 1, the trial court sentenced Ramos to life with the possibility of parole, plus 10 years for the personal use of a firearm under section 12022.53, subdivision (b) and 15 years for the criminal street gang enhancement under section 186.22, subdivision (b)(5). As to the attempted willful, deliberate and premeditated murder in count 2, the trial court imposed a consecutive term of life with the possibility of parole, plus one-third the 10-year firearm enhancement or 3 years and 4 months, and one-third the 15-year criminal street gang enhancement or 5 years. The trial court imposed concurrent terms on counts 3 and 4 and stayed the term imposed on count 5.

The People concede the sentence imposed by the trial court was incorrect in several respects. First, the criminal street gang enhancement found at section 186.22, subdivision (b)(5), requires service of a 15-year term before parole eligibility, not a 15-year enhancement. (§ 186.22, subd. (b)(5).) Further, section 1170.1, subdivision (a), which directs that a consecutive subordinate term shall consist of one-third the middle term or one-third of the term imposed for an enhancement, does not apply to indeterminate sentences. (*People v. Felix* (2000) 22 Cal.4th 651, 659 [94 Cal.Rptr.2d 54, 995 P.2d 186]; *People v. Mason* (2002) 96 Cal.App.4th 1, 15 [115 Cal. Rtpr. 2d 359].) Thus, as to count 1, the term should have been life with the possibility of parole with a minimum term of 15 years before parole eligibility, plus 10 years for the use of a firearm. The People assert a similar consecutive term properly could have been imposed as to count 2 for a total term of two life terms with a minimum term of 30 years before parole eligibility, plus 20 years.

The People argue this court should modify the judgment to impose the more substantial term under the rule that an unauthorized sentence may be corrected at any time even though the correct term may be more severe than the term initially imposed. (*People v. Serrato* (1973) 9 Cal.3d 753, 764 [109 Cal.Rptr. 65, 512 P.2d 289], overruled on another ground in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Ramos suggests the term be modified to life with a minimum term of 15 years before parole eligibility plus 10 years for the firearm use to avoid an unconstitutional increase in the term imposed. (See *People v. Hanson* (2000) 23 Cal.4th 355, 357 [97 Cal.Rptr.2d 58, 1 P.3d 650].) Alternatively, Ramos requests the matter be remanded because the trial court's errors may have affected its discretionary sentencing choices.

The term imposed by the trial court, life plus 33 years and 4 months, was severe. However, we are unwilling to correct the term imposed, and thereby increase it substantially, without permitting the trial court to exercise its discretion in the first instance. Accordingly, we remand the case for resentencing.

## DISPOSITION

The convictions underlying the judgment are affirmed but the matter is remanded for resentencing.

Croskey, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 1, 2004.