Filed 1/27/14  P. v. Basey CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TYREESE BASEY,<br><br>    Defendant and Appellant. | B239723<br><br>(Los Angeles County<br>Super. Ct. No. LA064105) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael K. Kellogg, Judge.  Affirmed.

John Alan Cohan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant, Tyreese Basey, appeals his conviction for attempted unlawful driving or taking of a vehicle, unlawful driving or taking of a vehicle, hit and run (property), carjacking and attempted carjacking, with a prior prison term enhancement (Veh. Code, §§ 664, 10851, 20002; Pen. Code, §§ 664, 215, 667.5).[1] He was sentenced to state prison for a term of ten years and six months.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Count 2: Attempted unlawful driving of the Cortez vehicle.*

Around 5:30 a.m. on January 9, 2010, Jose Cortez was returning home from work. As he was getting out of his car, he ran into defendant Basey who asked for Cortez's car keys. When Cortez refused, Basey tried to grab the keys. Cortez resisted and ran to the front of his apartment building and yelled for help. Basey pushed Cortez to the ground and hit him in the forehead while unsuccessfully trying to grab the keys. Basey fled when Cortez's neighbors came outside.

2. *Count 3: Carjacking of Uribe.*

Later that same morning, Rudy Uribe was in a donut shop in Van Nuys. He had just ordered food for himself and his daughter. He placed his car keys on the table and was reading a book while waiting for his order. Basey walked by and grabbed Uribe's keys.

Basey left the donut shop and tried to unlock a truck, but it wasn't Uribe's vehicle. Uribe approached and said, "I want my keys back." Basey asked, "Is this your truck?" Without answering, Uribe asked for his keys back. Basey again asked about the truck, this time more angrily. Uribe did not answer and Basey

---

[1] All further references are to the Penal Code unless otherwise specified.

walked over to Uribe's car, which was parked next to the truck. Uribe again approached and said, "I need my keys." Basey reached into his waistband and said, "I have a gun, you motherfucker." Uribe put his hands up and walked back to the donut shop. Basey drove off in Uribe's silver Toyota Avalon.

3. *Count 4: Hit and run.*

Between 7:00 and 7:30 a.m. that same morning, Jesse Arispuro, a security guard at the Skirball Cultural Center Museum, heard a loud boom and saw a silver car hit the curb, fly into the air, hit a tree, and lodge itself between a fence and the Skirball Center's water main. Rushing over to the crash, Arispuro saw Basey exit the car and walk past him. When Arispuro asked if he needed help, Basey said "no" and continued walking away. Arispuro's supervisor radioed him not to lose sight of Basey, so Arispuro followed him to the second floor of the parking structure. Basey tried to enter a Toyota truck, but it was locked. Basey then tried to enter an elevator, but Arispuro's supervisor had ordered the elevators locked. While heading toward a stairwell, Basey ran into Arispuro and his supervisor, who told Basey they had called the police to report a hit-and-run. Basey immediately fled.

4. *Count 6: Taking Leonard's vehicle.*

Shortly thereafter, at about 8:00 a.m., Christopher Leonard was at home in Encino when he heard the motor of his Ford Expedition running. The Ford was in his driveway and the keys had been left on his dining room table, which was visible from the side yard. The house was unlocked at the time. Leonard came out of the house and found Basey in the Ford's driver's seat. Leonard yelled, "What are you doing?" and banged on the Ford. Basey was struggling to get the vehicle into gear. When he was succeeded, he quickly backed out, sped down Leonard's steep driveway and crashed into a neighbor's brick wall. Leonard ran over and started banging on the Ford again, telling Basey to get out. Basey put the Ford into gear again and drove off.

3

5. *Basey's arrest*.

On the following day, Los Angeles Police Sergeant James Kim responded to a 911 call reporting a burglary suspect in a Laundromat on Lenox Ave. He found Basey standing in his boxer shorts inside the Laundromat. Kim handcuffed him and asked for identification. Basey directed him to a plastic shopping bag on the floor. Inside the bag, Kim found Basey's identification and a set of keys. When Kim hit the key alarm, a Ford Expedition activated. Basey was arrested.

## CONTENTION

The trial court erred by restricting the proposed testimony of a defense psychiatric expert.

## DISCUSSION

Basey contends the trial court erred by restricting a defense expert's proposed testimony about Basey's schizophrenia. This claim is meritless.

1. *Background*.

In April 2010, Basey was found incompetent to stand trial on the basis of psychiatric reports from Dr. Kory J. Knapke and Dr. Kaushal Sharma, and he was admitted to Metropolitan State Hospital (MSH). Knapke later submitted a second report concluding Basey was still incompetent, but Sharma's second report concluded Basey was now competent. On April 21, 2011, the trial court found Basey mentally competent to stand trial.

Before the jury was empanelled, defense counsel raised the issue of whether Dr. Knapke could testify. The trial court expressed concern about the relevancy of Knapke's testimony because his report had addressed competency, rather than the defense of not guilty by reason of insanity. Defense counsel took the position Knapke's opinion was relevant to the issue of Basey's specific intent,[2]

---

[2]     Both carjacking and the unlawful taking or driving of a vehicle are specific intent crimes.

4

arguing that "if a person believes . . . it's his property whether by a mental health [defect] or by mistake of fact, it's not a crime." Counsel said he expected Knapke's testimony to demonstrate Basey "suffered from a serious mental health defect from the date of arrest, that . . . he was under some . . . paranoid, delusional thoughts[, and] believed he was the [prophet] of god."

The trial court ruled Knapke's testimony might be relevant if Basey decided to testify and put his mental health at issue. Subsequently, the court held a mid-trial evidentiary hearing on the admissibility of Knapke's testimony. Although Knapke was not present for this hearing, defense counsel made a record based on a letter he had received from Knapke.

Defense counsel represented that, after reviewing the MSH records, the police reports, and the transcript of a police interview from when Basey was arrested, Knapke concluded Basey had been schizophrenic at the time of his arrest. Knapke did not believe Basey was malingering. Defense counsel said he planned to ask Knapke if someone suffering an extreme schizophrenic episode "could . . . believe truly that the property is his and they are a messenger of god," and that Knapke would agree a "person in that situation going through that delusion may truly believe that."

The trial court asked what Knapke would be talking about "other than schizophrenia in general?", to which defense counsel replied: "Delusional behavior, the medications that my client required to regain competency," and "that [Basey] is schizophrenic and delusional at times. That he was suffering at the time he observed him in Department 95. He was psychotic," and that he may have been "operating under those same type of delusions at the time of his arrest."

Defense counsel then said he specifically asked Knapke if someone who was delusional might steal a vehicle believing "that's through God *and not intending to take property* from another."[3] (Italics added.) The trial court replied: "When you use that last phrase, that's precluded in all case law. . . . Up until that point it's admissible. Up until the point where you changed it. By saying – and you didn't use specific intent[,] to form specific intent, you didn't use any of that. Just changing the wording or changing the definition doesn't change the purpose for which the testimony is being offered. [¶] If the testimony is being offered to preclude the ability of your client to form any specific intent, it's barred by both [sections] 28 and 29 of the Penal Code. . . . All you're doing is changing the language. By changing the language you're seeking admissibility of inadmissible evidence . . . ."

The trial court ruled Knapke "can and would be allowed to talk to this jury in general terms about schizophrenia, about disassociation, about delusion," but not about whether or not Basey had the ability to "make a conscious decision as to the specific intent involved." Defense counsel asked if Knapke would be permitted to offer an opinion as to "whether or not Mr. Basey was delusional or psychotic at the time these incidents occurred? Without going into specific intent to do these things, just was he . . . exhibiting delusional psychotic behavior at the time." The trial court said no: "It would be the same thing as using synonyms and make up another word that would be identical to specific intent. . . . [B]ecause *if you say that he is delusional or if he is compulsive at that time, it's one and the*

---

[3] Defense counsel said: "Then I asked [Knapke] in generalities what type of symptoms in . . . extreme cases someone with delusional thoughts or schizophrenia, what the symptoms would be and whether or not hypothetically a person can be . . . in this type of scenario that vehicles were in front [*sic*], that that's through God and not intending to take property from another."

*same of saying he didn't have the ability to form specific intent.* The doctors are precluded from doing that." (Italics added.)

Defense counsel subsequently indicated that, based on the trial court's ruling, Knapke would not testify.

2. *Standard of review.*

A trial court has broad discretion in determining whether to admit expert testimony and its ruling will be reversed on appeal only where the record reveals an abuse of discretion. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 ["the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown' "]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1205 [trial court did not abuse its discretion in refusing to admit expert testimony regarding police interrogation techniques and false confessions].)

3. *Discussion.*

Basey contends the trial court erred by limiting Dr. Knapke's testimony "to speaking about schizophrenia in generalities," and precluding him from testifying "whether appellant was operating under delusional behavior at the time of the charged offenses and whether . . . there was evidence from which the jury might infer that appellant lacked the mental state required to commit the charged crimes."

We disagree. Letting Knapke testify Basey was delusional when he committed the charged acts would, in effect, have allowed Knapke to testify Basey had been acting with a state of mind that negated specific intent. "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt

7

phase of a trial. [Citation.] Sections 28 and 29[4] permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*People v. Coddington* (2000) 23 Cal.4th 529, 582, fns. omitted, disapproved on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

In *People v. Nunn* (1996) 50 Cal.App.4th 1357, Nunn had been charged with assault with a deadly weapon and attempted murder after he fired his gun at several people for no apparent reason. Dr. Lipson, a clinical psychologist, examined Nunn and concluded that as a result of Vietnam war trauma he overreacted to stress and apprehension. Lipson also concluded the encounter giving rise to the criminal charges "was the type that could result in an impulsive reaction from one with appellant's mental condition." (*Id*. at p. 1365.) The trial court ruled Lipson's conclusion that Nunn had fired his gun impulsively was

---

[4] Section 28 states, in relevant part: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

Section 29 states: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

8

inadmissible because it amounted to an opinion about Nunn's intent at the time of the shooting.

The Court of Appeal found no error: "Appellant seems to suggest that section 29 allows an expert to express any opinion, however specific and determinative of the mental issues involved, as long as he does so without using the name of the specific mental state involved, for example, malice aforethought." (*People v. Nunn, supra,* 50 Cal.App.4th at p. 1363.) "We conclude section 29 does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted. An expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved. Nor may an expert evade section 29 by offering the opinion that the defendant at the time he acted had a state of mind which is the opposite of, and necessarily negates, the existence of the required mental state." (*Id.* at p. 1364.)

*Nunn* went on: "We conclude . . . sections 28 and 29. . . allow the presentation of detailed expert testimony relevant to whether a defendant harbored a required mental state or intent at the time he acted. Thus, in the present case it was permissible for Dr. Lipson to opine that appellant, because of his history of psychological trauma, tended to overreact to stress and apprehension. It was permissible for him to testify such condition could result in appellant acting impulsively under certain particular circumstances. Dr. Lipson could have evaluated the psychological setting of appellant's claimed encounter with the men at the fence and could have offered an opinion concerning whether that encounter was the type that could result in an impulsive reaction from one with appellant's mental condition. What the doctor could not do, and what the defense proposed he do here, was to conclude that appellant had acted impulsively, that is, without the intent to kill, that is, without express malice aforethought. *The court acted*

9

*properly in excluding Dr. Lipson's opinion that appellant fired his weapon impulsively.*" (*People v. Nunn, supra,* 50 Cal.App.4th at p. 1365, fn. omitted, italics added.)

In the case at bar, the trial court properly indicated Dr. Knapke would have been allowed to testify Basey suffered from schizophrenia, and to explain the symptoms and effects of that disorder. Knapke could discuss the details of Basey's condition, his hospitalizations, and the medications he had been prescribed. Knapke could explain the sort of delusions someone with Basey's diagnosis would typically experience, and opine that one such delusion would be the belief stolen property actually belonged to him because he was God's messenger. On the other hand, the trial court properly *precluded* Knapke from offering his opinion Basey was in fact delusional when he was taking or trying to take the vehicles. Such testimony could have been understood by the jury as Knapke's expert opinion that Basey lacked the requisite specific intent because he had been acting out of a delusion.

Basey cites *People v. Aris* (1989) 215 Cal.App.3d 1178, disapproved on other grounds in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1086, as a case where "restriction to testimony in 'generalities' was found to be in error." Aris killed her husband while he slept. At trial, she wanted to present expert testimony on battered woman syndrome to support her self-defense claim. Basey relies on the following portion of *Aris*: "[I]t was error not to permit Dr. Walker to testify . . . how the defendant's particular experiences as a battered woman affected her perceptions of danger, its imminence, and what actions were necessary to protect herself. An expert's opinion about a defendant's mental state does not violate section 29 as long as the expert does not express an opinion on the ultimate issue that defendant did or did not have a mental state required for a charged offense. [Citations.] Dr. Walker's proposed testimony that defendant was a battered woman and how being a battered woman affected defendant's

10

perceptions and conduct stops short of the ultimate issue of what defendant's perception actually was and, therefore, does not violate section 29." (*People v. Aris, supra,* 215 Cal.App.3d at p. 1198, fn. omitted)

But Basey is ignoring another portion of the same opinion: "However, Dr. Walker's opinion is inadmissible to the extent that it is testimony 'the defendant had or did not have . . . malice aforethought . . . .' [Citation.] Since having an actual perception that one is in imminent danger negates malice aforethought [citation], we hold that Dr. Walker was properly prohibited from stating an opinion that defendant actually perceived that she was in imminent danger and needed to kill in self-defense." (*People v. Aris, supra,* 215 Cal.App.3d at pp. 1197-1198.) If anything, the reasoning in *Aris* supports the trial court's ruling here.

Basey argues Knapke "should have been able to testify that, on the day of the charged offenses, appellant was gripped by *certain delusions*, so long as his cross examination did not offer an opinion on whether appellant's mental defect prevented him from having specific intent." (Italics added.) We disagree. It is clear from the record those "certain delusions" consisted of Basey's purported belief he was entitled to take the vehicles because he was acting on God's orders.[5] In this situation, Knapke's testimony that Basey was delusional at the time of the incidents amounted to expert evidence Basey did not have the specific intent required to commit either carjacking or the unlawful taking of a vehicle. Such testimony violates Penal Code sections 28 and 29.

---

[5] As Basey acknowledges: "In Dr. Knapke's report . . . he states that during his interview with detectives . . . appellant said that he is a 'prophet of God named Royal Republic and is a joint heir with God. All things belong to God and he, suspect Basey, can take whatever he wants but it was actually God taking those things through him.' "

11

The trial court did not abuse its discretion by restricting the scope of Knapke's proposed testimony.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.