Filed 2/9/21  P. v. Ochoa CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NATHANIEL OCHOA,<br><br>    Defendant and Appellant. | F077942<br><br>(Super. Ct. No. 15CR00404A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Nathaniel Ochoa (defendant) participated in a home invasion robbery at a residence occupied by a woman and her baby.  Believing there was a hidden box containing a large sum of money, the robbers ransacked the home and demanded the woman reveal its location.  At one point, defendant picked up the baby and threatened to

"take [it] away" if the woman did not disclose the information. After she continued to deny having such a box, defendant put down the baby and went on searching. The perpetrators left after finding approximately $2,000 inside of a diaper bag. The woman and her child were not physically harmed.

Defendant was arrested on suspicion of his involvement in the robbery. He was subjected to approximately 30 minutes of interrogation without being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Defendant made incriminating statements prior to receiving the *Miranda* warnings, and he provided a full confession after they were given. His statements were used against him at trial.

A jury convicted defendant of kidnapping for ransom in violation of Penal Code section 209, subdivision (a), which carries a mandatory life sentence. (All further statutory references are to the Penal Code.) He was also found guilty of first degree burglary, first degree robbery, and aggravated false imprisonment. Based on the holding of *People v. Martinez* (1984) 150 Cal.App.3d 579 (*Martinez*), disapproved on another ground in *People v. Hayes* (1990) 52 Cal.3d 577, 628, footnote 10, defendant argues he did not commit the crime of kidnapping for ransom. We agree and therefore reverse the conviction for insufficient evidence.

Defendant seeks full reversal of the judgment based on the violation of his *Miranda* rights and the alleged inducement of his confession by promises of benefits and/or leniency. These claims have merit. Consequently, the judgment must be reversed. Defendant will be subject to retrial on the charges of burglary, robbery, and false imprisonment.

## FACTUAL AND PROCEDURAL BACKGROUND

The victim lived with her husband and infant child in a trailer on a farm in Dos Palos. On December 11, 2014, the victim was home alone with her baby. At some point in the late morning or early afternoon, two people forced their way into the trailer. The victim later described the intruders as "a young man and a young girl."

The male intruder used plastic zip ties to bind the victim's hands in front of her body. He also bound her ankles together with duct tape. Once the victim was restrained, the intruders ransacked the home in search of money. Before leaving, the young man covered the victim's head with a blanket. Despite the effort to block her vision, she saw that a third person had entered the trailer.

After the perpetrators departed, the victim freed herself and contacted her husband. Two deputies from the Merced County Sheriff's Office were subsequently dispatched to the residence. The victim reported the theft of $2,000 in cash, which had been hidden inside of a diaper bag, and some gold jewelry. In her initial statements, she claimed to have held the baby in her arms throughout the incident. The male intruder had allegedly said, "Give us the money or we'll take the baby and stab you." (Some capitalization omitted.)

According to police reports, defendant (then age 19) and another man, S.L., were identified by fingerprints left on duct tape found at the crime scene. Through further investigation, a woman named Julia Rubio (then age 21), also known as Dimples, was identified as the female accomplice. An older man named "Tony" was rumored to have been the third intruder.[1] An unnamed fifth suspect, described as a man "in his late 40's to early 50's" (capitalization omitted), had allegedly assisted Tony in orchestrating the crime.

Defendant, Rubio, and S.L. were arrested and interrogated. S.L. explained the discovery of his fingerprints by alleging a family member had lent his roll of duct tape to defendant. Defendant and Rubio corroborated S.L.'s claim of innocence. Rubio

---

[1]Although Tony's full name and background information is provided in the police reports, the record does not indicate that he was ever prosecuted in connection with this case. We thus refer to him by first name only. (See Cal. Rules of Court, rule 8.90(b)(10).) The first suspect, S.L., was apparently cleared during the initial investigation, which is why his name is also being withheld. (*Ibid.*)

admitted to participating in the burglary and confirmed the involvement of defendant, Tony, and the unnamed middle-aged man.

Defendant was questioned by Rafael Chavez, who then worked as a detective for the Merced County Sheriff's Office. The recorded interview lasted approximately 50 minutes. During the first half hour, defendant was questioned without being advised of his *Miranda* rights. A detailed summary of the interview is provided in our Discussion, *post*.

During the pre-*Miranda* questioning, defendant was accused of being involved in a robbery the previous month. Detective Chavez asked about Tony and Rubio, and defendant admitted knowing them. The detective accused him of accompanying Tony on a trip to Dos Palos, but defendant denied it. However, defendant later insinuated that Tony had pressured him into going to Dos Palos to satisfy an outstanding debt. Tony was a reputed drug dealer, and defendant had owed him $100.

Following two short breaks, Detective Chavez provided a *Miranda* advisement and defendant waived his rights. Defendant then admitted to participating in the home invasion at Tony's behest. Tony had allegedly instructed him to search for a box containing $100,000. When he and Rubio failed to locate the box, Tony entered the trailer and began searching for it himself. Defendant said, "There was another guy involved too," but that person "didn't get out [of the vehicle]."

Defendant denied knowing the victim had been robbed of cash and jewelry. As far as he knew, Tony was given bad information about the box of money. When asked if Tony had taken anything from the trailer, defendant said, "I don't know. I didn't ask questions. Just got in the truck and we left."

Defendant took responsibility for tying up the victim but denied threating to stab her. He also implicitly denied threatening to abduct the baby. When asked if he had tried to "take the baby," defendant replied, "No. Well, I grabbed it—I grabbed the baby [and] told her, 'Where's the money at?'" He later clarified, "I told her, 'Give me the money.

4.

I'm gonna hold your baby.'" The victim insisted she was poor and had no money. Defendant "felt bad" for picking up the baby, so he handed the baby to the victim.

Defendant and Rubio were charged with kidnapping for ransom (§ 209, subd. (a); count 1), home invasion robbery (§§ 211, 213, subd. (a)(1)(A); count 2), residential burglary (§ 459; count 3), making criminal threats (§ 422; count 4), false imprisonment by violence (§§ 236, 237, subd. (a); count 5), and conspiracy to commit robbery (§§ 182, subd. (a)(1), 211; count 6). The conspiracy charge was later dismissed and the case against Rubio was severed. Defendant was tried separately in September 2017.

The victim and Detective Chavez were the People's only witnesses at trial. An edited video of defendant's custodial interview was shown to the jury during the People's case-in-chief. The defense case consisted of testimony by the deputies who had interviewed the victim on the day of the robbery.

Defense counsel argued that defendant committed the burglary/robbery under duress. Counsel attempted to refute the kidnapping and criminal threats charges by highlighting discrepancies in the victim's trial testimony as compared to her initial reporting of the incident and statements she had made on other occasions. At the close of evidence, the People stipulated the victim had "fairly recently" informed the prosecutor "that [defendant] did not threaten to stab her."

Defendant was found not guilty of making criminal threats. He was convicted as charged on the remaining counts. Following the denial of a motion for new trial, defendant was sentenced to four years in prison for first degree burglary and received an indeterminate life term for aggravated kidnapping. Stayed sentences were imposed for the convictions of robbery and false imprisonment. A timely notice of appeal was filed in August 2018.

## DISCUSSION

### I.  Admissibility of Defendant's Custodial Statements

Defendant filed a pretrial motion to exclude evidence of his custodial statements. His motion focused on statements preceding the *Miranda* warnings.  A secondary argument vaguely accused Detective Chavez of delaying the *Miranda* advisement for the purpose of "softening [him] up."  The moving papers cited *People v. Honeycutt* (1977) 20 Cal.3d 150, which has been held "distinguishable on its facts."  (*People v. Scott* (2011) 52 Cal.4th 452, 477; accord, *People v. Krebs* (2019) 8 Cal.5th 265, 306 ["*Honeycutt* has been limited to its facts"].)  Defendant did not purport to rely on the more relevant authority of *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*).  (See further discussion, *post*).

Defendant supplemented his "*Miranda* motion" with a motion in limine made on the ground of involuntariness.  The second motion relied on cases holding that a confession motivated by promises of benefit or leniency is inadmissible.  (E.g., *People v. Carr* (1972) 8 Cal.3d 287, 296.)  Detective Chavez was alleged to have used prohibited tactics by promising to speak to his sergeant about defendant being released from custody.

Detective Chavez testified at a related evidentiary hearing.  The testimony first addressed his general custom and practice regarding interrogations.  His methods include building a "rapport" with the suspect before the "interview" turns into "a potential interrogation."  He explained:  "[I]f we've moved past our rapport building and we start getting into the case and facts itself, I would have already moved past *Miranda* and all that getting into those.  If I'm getting into facts, it's because I've moved past *Miranda*, and [the suspect is] well aware of it."

Defense counsel attempted to show the pre-*Miranda* questioning of defendant was designed to elicit incriminating responses.  Detective Chavez generally acknowledged the

6.

subject matter of his questions. Defense counsel also asked him about the promises to talk to his sergeant.

Defendant's pre-*Miranda* statements were ruled admissible subject to redactions of irrelevant and unduly prejudicial material, e.g., remarks about defendant's gang history. The trial court reasoned "that [Detective] Chavez was just kind of confirming that maybe some of the stuff he had heard was true; that [defendant] did, in fact, know some of these people [i.e., Tony and Rubio]." The testimony of Detective Chavez was found to be credible.

The involuntariness claim was also rejected. The trial court explained, "The issue of the offer/promise to speak to the sergeant, I find that to be really a non-issue. It's not like there was a threat or cajoling or anything like that." After hearing additional arguments, the judge said, "I think [Detective] Chavez was very clear with [defendant] that it was not his decision to make as to what would happen with [defendant] with respect to his custodial status. [¶] I would also find that it appears that [defendant] is not quite as foreign to the criminal justice system as might be suggested because he's very familiar with being in custody, apparently, in Madera County."

### A. Standard of Review

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.) With a possible exception of the *Seibert* issue, defendant's claims are not affected by the evaluation of Deputy Chavez's credibility. "Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

7.

## B. Admissibility of Pre-*Miranda* Statements

"Under *Miranda*, police officers must warn a suspect before questioning that he or she has the right to remain silent and the right to the presence of an attorney." (*People v. Case* (2018) 5 Cal.5th 1, 20.) If a defendant is subjected to custodial interrogation without being advised of these rights, statements made during the interrogation cannot be used in the prosecution's case-in-chief. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162; *People v. Thornton* (2007) 41 Cal.4th 391, 432.) In "*Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508–509.) "Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224.)

The People concede defendant was in custody. However, in their briefing they twice allege "the record is unclear whether his arrest was for the instant crime or something else." Detective Chavez's investigation reports make clear he authored a "Ramey warrant"[2] for defendant's arrest based on fingerprint evidence found at the crime scene. The warrant was signed by a judge on January 22, 2015, and defendant was arrested the next day "in regards to [the] active arrest warrant[.]" The only reason defendant was in custody was because Detective Chavez believed he was involved in the robbery.[3]

An objective test is used to determine whether questioning qualifies as interrogation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–302; *People v. Elizalde*

---

[2]See *People v. Ramey* (1976) 16 Cal.3d 263. Upon a showing of probable cause, a peace officer may obtain "a so-called *Ramey* warrant" to make a residential arrest before criminal charges are filed. (*Goodwin v. Superior Court* (2001) 90 Cal.App.4th 215, 218; see § 817.)

[3]A transcript of the interrogation prepared by the district attorney's office attributes these statements to Detective Chavez: "I want you to know that the only reason you're here is because your name came up in a crime. [¶] … [¶] All right? There's a warrant… [¶] … [¶] I have a warrant out for your arrest." Listening to the actual recording, it is evident Detective Chavez said, "I wrote a warrant out for your arrest."

(2015) 61 Cal.4th 523, 536–537.) "Law enforcement officers may speak freely to a suspect in custody provided '"the speech would not reasonably be construed as calling for an incriminating response." [Citation.]'" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086–1087.) Legitimate examples of what Detective Chavez termed "rapport building" would include questions about a suspect's background and interests. (See *id*. at pp. 1081, 1087 [inquiries regarding suspect's "upbringing, his decision to join the Navy, and his hobbies" held permissible "to establish a rapport"]; *People v. Gamache* (2010) 48 Cal.4th 347, 384, 388 [neutral questions regarding suspect's military experience did not constitute interrogation].)

"Similarly, casual conversations or 'smalltalk' unrelated to the offense do not typically constitute a *Miranda* interrogation." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 87.) However, "the facts of any routine questioning or casual conversation must be carefully scrutinized to ensure that the police are not using the communication as a pretext for eliciting incriminating information." (*Id*. at p. 88.) Many of Detective Chavez's questions were not even pretextual; they were direct inquiries into defendant's involvement in a crime.

Defendant was questioned for approximately 30 minutes prior to receiving a *Miranda* advisement. The first 12 minutes were uninterrupted. Detective Chavez then left the room for approximately one minute and 45 seconds. Upon his return, the questioning continued for another 10 minutes. The detective exited a second time, left defendant alone for less than six minutes, and resumed speaking with him for another minute or so before reading the *Miranda* warnings aloud from a card.

Detective Chavez spent the opening minutes confirming neutral background information, i.e., defendant's name, date of birth, and home address in Madera County. Immediately thereafter, defendant was told his "name came up" in connection with a robbery reported in December by a woman in an unspecified part of Merced County.

9.

Detective Chavez then spent two minutes detailing his knowledge of defendant's criminal record and history of juvenile adjudications.

Next, Detective Chavez said that he had already talked to S.L. and knew "both sides … [¶] … [¶] as far as [S.L.'s] side and what happened." He offered defendant "the opportunity" to tell him anything he could remember from "back in December" that would explain his current "predicament." Defendant claimed to have spent the month of December with his girlfriend attending to matters related to her pregnancy. A brief exchange followed regarding the pregnancy.

Beginning approximately eight minutes into the questioning, defendant was repeatedly asked if he had ever been to Dos Palos. He responded with unequivocal denials. The detective persisted: "[I]s there any reason why I would have evidence of you being in Dos Palos? [¶] … [¶] … Is there is any reason why [¶] … [¶] there's evidence that would tell me you were in Dos Palos in December?" Defendant made additional denials, and Detective Chavez began questioning him about Tony.

The detective did not ask if defendant knew Tony. He simply said, "[I]s Tony locked up right now?" Defendant sought clarification before saying, "Uh, I don't know. I—I haven't seen him in a while." After defendant's association with Tony was confirmed, Detective Chavez made factual assertions: "[Y]ou rode with him to Dos Palos. You went with him to Dos Palos. Went with Tony." Defendant denied these allegations.

The questioning about Tony lasted for several minutes. Defendant said he owed Tony $100 but did not explain the nature of the debt. Detective Chavez asked why a casual acquaintance would have lent him that much money. He also claimed to know defendant had purchased marijuana from Tony in the past.

The questions about Tony segued into a brief conversation about defendant's gang membership. The detective switched topics by asking, "[H]ow do you know Dimples [i.e., Rubio]?" It was the same technique as before; the phrasing was a subtle assertion of

defendant's connection to a suspected accomplice. Defendant said he knew Rubio through a friend. A few questions later, Detective Chavez asked, "Um, is there any reason why you, Tony, and Dimples go to kick it in together?" This marked a turning point in the conversation. Defendant replied, "You know what sir. I'm gonna be honest with you. [¶] … [¶] … You know a lot. You ain't stupid. [¶] … [¶] … And what I tell you, sir, is there any way I'll go home?"

Detective Chavez's response and subsequent conduct forms the basis of defendant's involuntariness claim, which we discuss later in the opinion. Relevant to the present issue, defendant went on to make these statements:

> "[Tony] kept coming to my house. I owe him some money and he—he kept coming to my house, I mean, he wants [his] money. Where's his money? Where's the money? I didn't have money. I was[n't] working at the time. I just got out of jail. He told me, 'Hey, look, man. I—I got this little thing, I mean, just help me out.' And (unintelligible). [¶] … [¶] … I mean, (unintelligible) I'm, like, 'I-I-I-I-I don't wanna go. I don't wanna go.' And I know Tony. He's not gonna play with it."

Later, but still prior to the *Miranda* advisement, defendant became emotional and his voice began to crack. He put his head in his hands and at one point said, "I didn't wanna do it." Detective Chavez offered words of encouragement: "You were just trying to pay a debt, right? You get sucked … into [it.] Sometimes you feel like you have no choices." Soon afterward, defendant said, "Just take me to jail, man. Take me to jail, man."

Viewed objectively, Detective Chavez's pre-*Miranda* questioning was interrogation. The People resist this conclusion, arguing the questions were "non-incriminatory." They make the same argument as to defendant's denials about being in Dos Palos and his admitted association with Tony and Rubio. The People further contend defendant's implied admissions of guilt were "spontaneously volunteered" and thus outside the scope of *Miranda*. We disagree.

11.

"[S]tatements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." (*Miranda*, *supra*, 384 U.S. at p. 477; see *People v. Kimble* (1988) 44 Cal.3d 480, 496 [false exculpatory statements imply consciousness of guilt]; *People v. Carrillo* (1995) 37 Cal.App.4th 1662, 1669–1670 [same].) In closing argument, while attacking the defense theory of duress, the prosecutor said defendant's purported fear of Tony was likely a "fabrication." To support this argument, the prosecutor reminded jurors of the "seven separate lies he [told] about never being in Dos Palos."

The questions regarding defendant's presence in Dos Palos were reasonably likely to elicit incriminating responses. The same is true of questions concerning Tony and Rubio. (See *Williamson v. United States* (1994) 512 U.S. 594, 603 [depending on the circumstances, statements linking oneself to others may be self-inculpatory].) As for the People's third argument, it misconstrues the applicable law. "Statements volunteered *when not in response to an interrogation* are admissible against a defendant." (*People v. McDaniel* (1976) 16 Cal.3d 156, 172, italics added.) "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." (*Oregon v. Elstad* (1985) 470 U.S. 298, 307 (*Elstad*).) We conclude defendant's statements were the product of interrogation and therefore inadmissible.

Violations of *Miranda* are subject to the harmless error test described in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Case*, *supra*, 5 Cal.5th at p. 22.) "'That test requires the People … "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" (*Ibid*., quoting *People v.*

12.

*Elizalde*, *supra*, 61 Cal.4th at p. 542.) Defendant's incriminating statements were either duplicative of, or less impactful than, the admissions made in his post-*Miranda* confession. The question of prejudice therefore depends on the admissibility of the confession. As we will explain, the confession should have been excluded and the error was not harmless.

## C. Admissibility of Post-*Miranda* Statements

### 1. Seibert Claim

In *Seibert*, the United States Supreme Court disapproved of two-stage interrogation techniques used to circumvent the protections of *Miranda*. The case involved officers who had been trained to "question first, then give the warnings, and then repeat the question[s]." (*Seibert*, *supra*, 542 U.S. at p. 605 (plur. opn.).) The *Seibert* defendant was arrested in the middle of the night, taken to a police station, and questioned for approximately 30 to 40 minutes without being advised of her *Miranda* rights. After she had incriminated herself, the officers gave her a 20-minute break and then conducted a recorded interrogation that began with a *Miranda* warning and "was 'largely a repeat of information … obtained' prior to the warning." (*Seibert*, at pp. 604–606.)

A plurality of four justices concluded "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." (*Seibert*, *supra*, 542 U.S. at p. 613 (plur. opn.).) "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." (*Ibid.*) Therefore, such confessions must be excluded from evidence unless, under the circumstances, "the *Miranda* warnings given could reasonably be found effective." (*Id.* at pp. 604, 611–612 & fn. 4 (plur. opn.); see *id.* at p. 621 (conc. opn. of

13.

Kennedy, J.) [observing the plurality's test "envisions an objective inquiry from the perspective of the suspect"].)

The *Seibert* plurality test considers multiple factors: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Seibert*, *supra*, 542 U.S. at p. 615 (plur. opn.).) Justice Kennedy concurred in the judgment but did not endorse the factor test. He proposed "a narrower test applicable only in the infrequent case … in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622 (conc. opn. of Kennedy, J.).) Under the narrower approach, "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." (*Ibid.*)

Justice Kennedy felt the plurality's test "cuts too broadly." (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) He expressed concern over its application to "unintentional two-stage interrogations" (*id.* at p. 621), noting that sometimes "[a]n officer may not realize that a suspect is in custody and warnings are required" (*id.* at p. 620). In his view, excluding a post-*Miranda* confession under those circumstances "would serve 'neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence ….'" (*Ibid.*, quoting *Elstad*, *supra*, 470 U.S. at p. 308.)

"The fractured nature of *Seibert* has given rise to a debate over whether it is the plurality's opinion or Justice Kennedy's concurrence that provides the controlling standard." (*People v. Krebs*, *supra*, 8 Cal.5th at p. 309.) Recently, in *Krebs*, the California Supreme Court discussed both standards but said, "We need not decide the

14.

matter here, as the result in this case would be the same under either approach." (*Ibid*.) At present, the issue remains unresolved.

Relying on opinions from other districts, both parties contend the applicable standard is Justice Kennedy's test. (E.g., *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1105; *People v. Camino* (2010) 188 Cal.App.4th 1359, 1370.) However, the People maintain defendant's *Seibert* claim has been forfeited. They also disagree with his substantive arguments. We decline to decide any of those issues because, regardless of whether *Seibert* applies, defendant's alternative claim regarding the involuntary nature of his confession is well taken.

*Seibert* created an exception to the general rule, established in *Elstad*, that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Elstad*, *supra*, 470 U.S. at p. 314.) Outside of the *Seibert* context, the admissibility of statements following a *Miranda* waiver depends on whether the statements were "voluntarily made." (*Elstad*, *supra*, at p. 318; see *People v. Young* (2019) 7 Cal.5th 905, 924–926.) Defendant argues his confession was motivated by promises of a benefit, thereby rendering it involuntary as a matter of law. (See, *post*.)

### 2.      *Involuntariness*

"'Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.'" (*People v. Wall* (2017) 3 Cal.5th 1048, 1065.) It is the People's burden to establish voluntariness by a preponderance of the evidence. (*Id*. at p. 1066.) The issue presents "a mixed question of law and fact that is nevertheless predominantly legal" and subject to de novo review. (*People v. Mickey* (1991) 54 Cal.3d 612, 649; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1177 ["The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent

review"].)  "So too [are] determinations as to the presence of coercive state activity and the existence of causality."  (*Mickey*, *supra*, at p. 649.)

"'In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward....'  [Citation.]"  [Citation.]  However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.'"  (*People v. Tully* (2012) 54 Cal.4th 952, 985–986.)  Releasing a suspect from custody, even on his own recognizance pending further proceedings, is a form of leniency.  (*People v. Vasila* (1995) 38 Cal.App.4th 865, 874–875; see *People v. Thompson* (1980) 27 Cal.3d 303, 328, fn. 31 ["There is no constitutionally significant distinction" between promising to release someone from custody and promising no charges will be filed against that person].)

In *People v. Flores* (1983) 144 Cal.App.3d 459, this district held a defendant's confession was unlawfully induced by, inter alia, "the implied promise that he might be released from custody until trial."  (*Id*. at p. 472.)  The *Flores* case is otherwise distinguishable, but defendant's claim is based on the same type of inducement. Defendant repeatedly told Detective Chavez he wanted to "go home."  The detective said he would "try to work that out" for defendant by talking to his sergeant, whom he portrayed as the ultimate decision maker.  The critical exchange occurred shortly before the *Miranda* advisement.  Immediately following the *Miranda* advisement, Detective Chavez told defendant "the fastest way to get home … [i]s to be completely honest."

The law generally prohibits "even a mild promise of leniency."  (*Brady v. United States* (1970) 397 U.S. 742, 754; see *People v. Neal* (2003) 31 Cal.4th 63, 79 [A statement is involuntary if "'"""obtained by any direct or implied promises, however slight …."""  [Citations.]"].)  However, involuntariness requires causality, meaning the

16.

improper conduct must be "'a motivating cause of the decision to confess.'" (*People v. Wall*, *supra*, 3 Cal.5th at p. 1066; accord, *People v. Ray* (1996) 13 Cal.4th 313, 339.) "'This rule raises two separate questions:  was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?'" (*People v. Tully*, *supra*, 54 Cal.4th at p. 986.)

Early in the interrogation, after defendant had talked about his pregnant girlfriend and his anticipation of becoming a father, Detective Chavez said, "[T]his would be in your benefit then—it'd be beneficial to you and to me and everybody really, but mostly you is [*sic*] to be truthful and to tell me … [¶] … [¶] the truth."  A few seconds later, defendant said, "I'm just trying to go home to my lady, sir."  The detective's statement at this juncture was permissible.  Mere "'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.'" (*People v. Hill* (1967) 66 Cal.2d 536, 549.)  "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity."  (*Ibid*.)

Following a series of questions about Dos Palos, defendant said, "I'm just trying to go home to my [girlfriend], sir.  [¶] … [¶] If you could help me do that, sir, I would appreciate it."  Detective Chavez replied, "Well, I'm here to tell you that, um, uh, that's why it's beneficial for you to tell me the truth, right?  And I'm only gonna ask you so many times so the more—the more truthful you are with me and I feel—and I feel that you're truthful with me then …."

Detective Chavez was interrupted by defendant and did not finish his statement.  A few seconds later, he started asking defendant about Tony.  Although Detective Chavez arguably began connecting the supposed benefit of being truthful to defendant's desire to go home, his remarks were ambiguous.

The questions about Tony lasted for approximately eight minutes, followed by a short discussion regarding defendant's gang history. Defendant then said, "I'm just trying to go home, sir." Detective Chavez ignored the comment and asked him about Rubio. As previously discussed, there was a turning point at about 18 minutes into the interview when the detective asked about both Tony and Rubio.

The following corresponds to the six minutes leading up to the break before the *Miranda* advisement. Bracketed annotations indicate what can be seen and heard on the video. Bracketed words or phrases in statements attributed to defendant and Detective Chavez indicate a discrepancy between what was transcribed by the district attorney's office and what can be heard on the video. The transcript inexplicably places the names of Tony, Rubio, and S.L in parentheses, which we have omitted.

"Q: Yeah. Um, is there any reason why you, Tony, and Dimples go to kick it in together?

"A: You know what, sir? I'm gonna be honest with you.

"Q: Yeah.

"A: I mean, you know a lot. You ain't stupid.

"Q: Mm-hm.

"A: And what I tell you, sir, is there any way I'll go home?

"Q: I'm not making any promises, man. I'm not making any promises because …

"A: I know. I'm just asking you, sir.

"Q: … because I don't wanna be a liar at the end of this, right? I don't wanna be a liar. I don't wanna tell you yes and then if I say yes, [—] you know who has the ultimate decision? Is my sergeant, right? So I don't wanna be a liar saying, yes and …

"A: Well can—can you talk to your sergeant?

"Q: I could talk to him. I'd be more than willing to do that for you, right? More than willing to do that for you.

18.

"A: Um, how's he gonna know?  Uh, can this not be in paper?

"Q: That's gonna be tough.  It's gonna be [] tough not to be in paper, but—but I'll—I'm already gonna talk to my sergeant for ya 'cause he has the ultimate decision, I don't.

"A: Can he come in here and talk to 'em?

"Q: Huh?  He's not in the office right now.  We can go to his office, you can see he's not here.

"A: Look, sir …

"Q: He's out rollin' around.

"A: I owe him some money.

"Q: You owe who money?

"A: Tony.

"Q: Okay.

"A: And he kept coming to my house.  [(*Long pause*)]  I owe him some money and he—he kept coming to my house, I mean, he wants [his] money.  Where's his money?  Where's the money?  I didn't have money.  I was[n't] working at the time.  I just got out of jail.  He told me, 'Hey, look, man.  I—I got this little thing, I mean, just help me out.'  And (unintelligible).

"Q: [Squash it]?  [*Indicating he understood there was a proposal to satisfy the debt.*]

"A: I mean, (unintelligible) I'm, like, 'I-I-I-I-I don't wanna go.  I don't wanna go.'  And I know Tony.  He's not gonna play with it.

"Q: Yeah.

"A: I don't know, sir.  I–I just wanna–I just wanna go home to my—my wife, man.

"Q: I'm gonna try to work that out for ya.

"A: She just said—I mean, how's she's …

"Q: She's pregnant.

"A: … she's pregnant, man.

19.

"Q: She's pregnant, she needs you, the baby needs you, right? Listen …

"A: Well, I'm only 19, [fool] …

"Q: Nathaniel, listen, I have kids, bro, I—I know—I know what that's like to wanna go home so believe me when I tell you I'm gonna go talk to my sergeant and say, 'Hey, listen, this guy was being truthful, he's being honest, right?'

"A: [I ain't tryin' to go to jail, fool] —I didn't wanna do it, fool. I'm—but—I'm—I'm gonna have—I'm [about to] have a baby, man.

"Q: I know what that's like 'cause I have kids.

"A: I'm only fuckin' 19, man.

[*During this time defendant is emotional and appears to be crying. He holds his head in his hands through part of the exchange*.]

"Q: What happened?

"A: [There's no need talking about it.]  (Unintelligible) I know that I'm going anyways.  [*It is very difficult to understand the last part of defendant's statement.  But the transcript does convey the substance of his remarks.  As confirmed by the detective's response, defendant was saying he assumed he would not be going home*.]

"Q: How do you know?  I'm gonna go talk to him.  [*Referring to his sergeant.*]

"A: (Unintelligible) help me out, man.  [*The exact words are unclear, but defendant is expressing doubt and skepticism that Detective Chavez will help him.*]

"Q: Nathaniel, you don't know me.

"A: I mean, people are talking, man, they're gonna fuckin' smoke me.

"Q: We've never met.  I'm being completely honest with you just like I was with [S.L.]  I know.  [(*Long pause*)]  I know you're not that guy, man.

"A: Hm?

20.

"Q: You were just trying to pay a debt, right?  You get sucked in just like, you know, raising into yet [*sic*].  Sometimes you feel like you have no choices. Sometimes you feel that way.

"A: Can I call my girl?

"Q: After we talk.

"A: What did [S.L.] say?

"Q: Huh?

"A: What did he say?

"Q: I wanna talk to you first before [S.L.]

"A: You ain't talked to him yet?

"Q: I've talked to [S.L.]

"A: [Unintelligible] to me?

"Q: No, he doesn't know [I'm talking to] you.

"A: [Don't tell him anything I said.]

"Q: No.

"A: Just take me to jail, man.  [*sniffling*]  Take me to jail, man.

"Q: Um, give me one [minute].  I'm gonna go talk to my sergeant, all right?

"A: [About what?]

"Q: I'm trying to help you out, right?  I'm trying to do this the right way.

"A: What are you gonna tell him?

"Q: Just like I was telling you—being cooperative, you're talking to me, you're not being a dick, right?  That—that goes—that goes a long way, man.

"A: He's sti—I ain't even gonna go home.

"Q: How do you know?  You don't—you've never dealt with us. You've dealt with everybody in Madera.  That—let me—let me go do that.

21.

"A: Can we do it in here?

"Q: Huh?

"A: (Unintelligible) [him in] here?

"Q: He's not here. I gotta call him on the phone. I'm not gonna talk to him right here on the phone.

"A: Probably [lying] to me, dude.

*[Detective Chavez stands up and moves toward door, then stops and turns to defendant.]*

"Q: Uh, why would I lie? I have to reason to lie to you [*sic*].

"A: Sir …

"Q: I have no reason to lie to you.

"A: … I'm just trying to go home to my new girl[].

"Q: I've been completely honest with you this whole time. I have no reason to lie to you and honestly, I feel offended that you don't believe me because, you know, I've—I've been straight with you this whole time. I let you have a smoke out there. I'm not being mean to you, bro. All right? Let—let me go make that phone call.

"A. What are you gonna tell him?

"Q. It's just like I told you right now. [*Detective Chavez walks out of room*.]"

Detective Chavez left the room for approximately five minutes and 30 seconds. On the video, he can be heard speaking off camera before reentering. He asked someone if they could "keep on" calling "Sarge." The other person said, "Yeah." Next, Detective Chavez reentered the room and provided a narrative that transitioned into a reading of the *Miranda* warnings. Less than two minutes later, defendant began providing further details of his involvement in the crime. The relevant exchange was as follows:

"Q: All right, man. Um, he didn't answer. Still trying to talk to him. Um, but, I have a buddy over there—he's gonna make the—try to make—keep calling, all right? Um, there's a lot of things—there's a lot of things that have to get answered—a lot of questions, um, that I wanna talk

to you about that, um, that, uh, that need to [be] answered, right? And you know—you know what it's about. I know what it's about and before we go, you know, into those things, we gotta just clarify those things, you know what I mean? You understand what I'm saying? So in order to clarify those things, we just gotta—get past—past this emotional—emotional hump, right? And once we're done with that, I'm still gonna hold—hold whatever I'm trying to do right now [—] [he could probably walk in] at any minute saying, [']hey, I just called him right now. He wants to talk to you.['] So what—whatever, right? I'm not—I'm not, like, I said, not making any promises, but there we are. All right? So before we can do that, we gotta get things out of the way.

"A: I don't want it on paper.

"Q: Huh? You don't want it on paper? All right, just know, um, not—not on paper, but just know you have rights, right? Everybody has rights so we gotta get those out of the way, so you have the right to remain silent. Anything you say may be used against you in court.

"A: (Unintelligible)?

"Q: You have the right to the pre—I didn't say that. Let me finish reading. You have the right to the presence of an attorney. If you cannot afford an attorney, one will be appointed to you free of charge before any questioning if you wish. Do you understand these rights?

"A: Yes.

"Q: So, you have all these questions that have to be answered, right? And who whose involvement and where and—and who belongs to this and the, uh, the reasons that may or may not lead up to this stuff, you know, you have to—the fastest way to get home, right? Is to be completely honest and we've talked about this and I'm not gonna—I'm not trying to—to bust your brain about it, right?

"A: Can this not be on paper?

"Q: Not—not on paper. I'll put my notebook away.

"A: (Unintelligible)?

"Q: What's up?

"A: (Unintelligible). [Whatever I tell you is] not gonna be used against me on paper.

23.

"Q: Well, I—I read you your rights though right? And just so you understand that and y—so—yeah.

"A: It's not gonna be on paper?

"Q: No.

"A: So if I get locked up, I go to the module …

"Q: You go to [what] module[?]

"A: So my module?

"Q: Your home?

"A: Uh, yeah.

"Q: If you get locked up?

"A: Yeah.

"Q: No, you'll be in Merced.

"A: Yeah, I'm gonna go to the module though?

"Q: Yeah. But [what's] module?

"A: [With my homies.]

[*Defendant is asking if he would be placed in segregated housing with members of his gang.*]

"Q: Yeah, [oh, yeah,]—yeah. We're not gonna—we're not gonna put you in just in the GP or general—whatever they call it in Madera.

"A: Um, just try to help me out, sir. I didn't wanna do it. Uh, like, I say, I—I owed him a $100, he came onto me tellin' me, 'Come on. Get in the car. You—you (unintelligible) …'"

The People suggest Detective Chavez's statements about "not making any promises" establish "there was no promise of a reward for waiving *Miranda* rights or confessing." "The viewpoint is too narrow, for promises can be implicit as well as explicit, and an assertion that no promises are being made may be contradicted by subsequent conversation." (*People v. Andersen* (1980) 101 Cal.App.3d 563, 579, citing *People v. Hill*, *supra*, 66 Cal.2d at pp. 549–550.) The People further contend Detective

24.

Chavez "made no promise that his sergeant would or could do anything." The latter contention is simply incorrect. The detective identified his sergeant as the person who would make "the ultimate decision" about whether defendant could "go home."

In determining whether an interrogator's statements convey promises, we "do not consider the words spoken in a vacuum but in the context of the conversation." (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1203.) Detective Chavez's statements conveyed two important messages. The first message was a promise to advocate for defendant's release by speaking to his sergeant. A notable example is when defendant said, "I just wanna go home" and the detective replied, "I'm gonna try to work that out for ya." Another example is when Detective Chavez said, "Nathaniel, listen, I have kids, bro, … I know what that's like to wanna go home so believe me when I tell you I'm gonna go talk to my sergeant and say, 'Hey, listen, this guy was being truthful, he's being honest.'"

When Detective Chavez testified at the evidentiary hearing, he admitted the statement about trying to "work that out" for defendant was in reference to calling his sergeant. He was also asked, "[Did you want] Nathaniel to appreciate that you would speak with your sergeant to intervene with Nathaniel to seek his release because of the kind of cooperation that Nathaniel had offered was helpful to your investigation …?" Detective Chavez answered, "Yes, but we always review cases with our sergeant." Whatever the purpose of the qualifying statement, the "Yes" response confirms what he was trying to accomplish.

The second message indicated defendant's continued disclosure of incriminating information could result in him being released from custody. It must be remembered that most of the interrogation consisted of pre-*Miranda* questioning. After breaking down and making implied admissions of guilt, defendant expressed doubts about the prospect of going home. Detective Chavez obviously wanted to elicit a post-*Miranda* confession and thus made several attempts to reassure him, e.g., "How do you know? I'm gonna go talk to him [i.e., the sergeant]." When defendant said, "Take me to jail," the detective

25.

told him, "I'm gonna go talk to my sergeant," "I'm trying to help you out." Defendant expressed further skepticism ("I ain't even gonna go home"), and Detective Chavez replied, "How do you know? You don't—you've never dealt with us [i.e., the Merced County Sheriff's Office]. You've dealt with everybody in Madera. … [L]et me go do that [i.e., call the sergeant]." The only ostensible reason for calling the sergeant was to discuss the possibility of defendant's release.

Immediately following the *Miranda* warnings, Detective Chavez said, "[T]he fastest way to get home, right? Is to be completely honest and we've talked about this." The People argue the words "we've talked about this" qualified the statement by somehow alluding to Detective Chavez's previous disclaimer that he had no authority to release defendant and only his sergeant could make that decision. This argument ignores the rest of the sentence. The detective said, "[T]he fastest way to get home, right? Is to be completely honest and we've talked about this *and I'm not gonna—I'm not trying to—to bust your brain about it*, *right*?" (Italics added.)

The italicized remarks were accompanied by hand gestures. Detective Chavez pointed to his head and then shook his fists in front of his face. Taken in context, "we've talked about this" cannot reasonably be construed as a statement of qualification. He was essentially saying there was no need to "bust [defendant's] brain" about previously discussed aspects of the case.

We conclude "the fastest way to get home… [i]s to be completely honest" was an unqualified statement. It meant that waiving his rights and further detailing his role in the offenses could result in defendant being released from custody, but exercising the right to remain silent carried no such possibility. It was an implied promise of an advantage (including having Detective Chavez lobby for his release) and possible benefit associated with making further statements. (Cf. *In re Shawn D*. (1993) 20 Cal.App.4th 200, 214 [interrogator "said that if appellant told the truth his honesty would be noted in [the] police report but that if appellant lied, the deception would also be documented. Telling

26.

appellant that his honesty would be recorded in the police report obviously implied that appellant would be treated more favorably if he told the truth"].)

This case is distinguishable from those in which an interrogator's generalized promise to intercede in a subsequent prosecution phase was held permissible. For example, the detective in *People v. Ramos*, *supra*, 121 Cal.App.4th 1194 acted lawfully in telling a suspect "'that, by his cooperation and assistance in identifying the other people involved in the shooting, that it would benefit [him] in the judicial process because [the detective] would bring … [his] statements to the district attorney's office for consideration.'" (*Id.* at p. 1200; see *id.* at pp. 1203–1204; accord, *People v. Jones* (1998) 17 Cal.4th 279, 297–298 [detective's offer to tell the district attorney that defendant had been honest "amounted to truthful implications that his cooperation might be useful in later plea bargain negotiations"].) Similarly, in *People v. Carrington* (2009) 47 Cal.4th 145, the "interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way." (*Id.* at p. 174.)

Unlike in *People v. Carrington*, Detective Chavez *did* suggest his input could be influential in the sergeant's decision regarding a specific benefit, i.e., defendant being released from custody. He said he would "try to work that out" for defendant by telling his sergeant defendant was being truthful and cooperative. In an effort to reassure defendant, the detective told him cooperation "goes a long way." Those circumstances, and the prolonged emphasis on contacting the sergeant, also distinguish this case from *People v. Falaniko* (2016) 1 Cal.App.5th 1234, which is cited in the People's brief. In *Falaniko*, police officers told a suspect, "'[I]t's in your best interest to be cooperative with us'" and "'with everything you got going on, the judge is going to look at that and say, you know, that you're being cooperative.'" (*Falaniko*, at p. 1249.) The appellate court concluded those "'brief and bland references'" to an unspecified benefit did not "rise to the level of coercion or promises of leniency." (*Id.* at p. 1250.)

"'It is apparent that when the police interview a suspect, they must skate a fine line'" between acceptable and impermissible tactics. (*People v. Flores*, *supra*, 144 Cal.App.3d at p. 470; accord, *People v. Holloway* (2004) 33 Cal.4th 96, 117.) In this instance, the line was crossed. Defendant was not merely informed of a benefit "which flows naturally from a truthful and honest course of conduct." (*People v. Hill*, *supra*, 66 Cal.2d at p. 549.) He was instead "given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, … in consideration of making a statement." (*Ibid.*) We thus proceed to the issue of causation.

As discussed above, improper police conduct must be "'a motivating cause of the decision to confess.'" (*People v. Wall*, *supra*, 3 Cal.5th at p. 1066.) Causation is determined by the totality of the circumstances. (*Ibid.*; accord, *People v. Winbush* (2017) 2 Cal.5th 402, 452 ["A confession's voluntariness depends upon the totality of the circumstances in which it was made"].) Courts consider "both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)

"When considering the characteristics of the accused, we look to his 'age, sophistication, prior experience with the criminal justice system and emotional state'" (*People v. Vasila*, *supra*, 38 Cal.App.4th at p. 876), as well as his education, maturity, physical condition, and mental health (*People v. Williams* (1997) 16 Cal.4th 635, 660). Relevant details of the interrogation include "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; [and] its continuity.'" (*Williams*, at p. 660; accord, *People v. Winbush*, *supra*, 2 Cal.5th at p. 452.) Another factor is "the lack of any advice to the accused of his constitutional rights." (*Schneckloth v. Bustamonte*, *supra*, 412 U.S. at p. 226.)

Defendant was a 19-year-old high school dropout who never finished the 10th grade. He came across as reasonably intelligent during the interrogation. Defendant was relaxed in the early stages of questioning, appeared physically healthy, and showed no

signs of mental impairment. As found by the trial court, he was presumably familiar with custodial settings based on his criminal history and juvenile record. He claimed to have recently served time in jail and made a comment about knowing "the system."

Deputy Chavez testified the interrogation took place at the Merced County Sheriff's "investigations office." Defendant remained handcuffed and seated in a closely confined space for approximately 50 minutes, including during two short breaks of less than two minutes and six minutes, respectively. Detective Chavez described the space as a "small room" but did not know the dimensions. As depicted in the video, it looked like a walk-in closet furnished with a table and two chairs. In a conversation between S.L. and Detective Chavez, which appears at the beginning of the video, S.L. complained about feeling "claustrophobic" inside the room.

Detective Chavez was calm and soft-spoken throughout the interrogation. However, "'[s]ubtle psychological coercion'" is sometimes employed more effectively than aggressive tactics "'to overbear "a rational intellect and a free will."'" (*People v. Flores*, *supra*, 144 Cal.App.3d at p. 468, quoting *United States v. Tingle* (9th Cir. 1981) 658 F.2d 1332, 1335, italics omitted.) Defendant's emotional state progressively deteriorated as the detective revealed the extent of his knowledge about the robbery. After approximately 18 minutes of questioning, defendant's once relaxed and confident demeanor had turned somber. He said, "[Y]ou know a lot. You ain't stupid." "And what I tell you sir, is there any way I'll go home?" This marked the beginning of what defendant has called the "'sergeant contrivance.'" A few minutes later, he was on the verge of tears and impliedly admitting guilt (e.g., "I didn't wanna do it"). When defendant emphasized his desire to go home to his girlfriend, Detective Chavez said, "She's pregnant, she needs you the baby needs you." "… I have kids bro, … I know what it's like to wanna go home."

"Unlike most implied promise cases, much of the conduct at issue occurred during an improper pre-*Miranda* interrogation. As noted, "[f]ailure to administer *Miranda*

warnings creates a presumption of compulsion." (*Elstad*, *supra*, 470 U.S. at p. 307.) Therefore, "'the crucial element of police coercion'" existed during most of the questioning. (*People v. Williams*, *supra*, 16 Cal.4th at p. 660.)

The lengthy excerpts quoted above show Detective Chavez's reassurances about calling his sergeant were made in direct response to defendant's expressions of hopelessness and lack of interest in continuing the discussion. Defendant said, "Just take me to jail man. Take me to jail." Had defendant been mindful of his Fifth Amendment rights, he might have terminated the questioning. But at that point, nearly 25 minutes into the interrogation, no *Miranda* advisement had been given. Whatever the explanation for the *Miranda* violation, the pre-*Miranda* interrogation left defendant in an emotionally vulnerable condition. Therefore, his emotional state and the lack of advice regarding his constitutional rights (which entails the crucial element of coercion) are factors weighing in favor of defendant's argument.

Also weighing in defendant's favor is the brief interval between the enticement and the confession. Although "'no single factor is dispositive'" (*People v. Wall*, *supra*, 3 Cal.5th at p. 1066), "the timing and sequence of events" is important (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884). For example, causation was found in *Gonzalez* and *People v. Perez* (2016) 243 Cal.App.4th 863 based on the appellants' immediate responses to promises of a benefit. (*Perez*, *supra*, at p. 876; *Gonzalez*, *supra*, at pp. 883–884.) Longer gaps in time between the promise and the confession tend to indicate the former was not a motiving cause of the latter. (See, e.g., *People v. Linton*, *supra*, 56 Cal.4th at pp. 1174, 1177 [implied promise made during morning interrogation not a motiving cause of appellant's late afternoon confession]; *People v. Carrington*, *supra*, 47 Cal.4th at pp. 170–171 [no causation where comments at issue made one hour prior to appellant's confession].)

Going into the break preceding the *Miranda* warnings, defendant was ready to stop talking and had accused Detective Chavez of lying about trying to help him. The

detective used several techniques to keep him engaged, i.e., promising to call the sergeant; suggesting the Merced County Sheriff's Office might do things differently from law enforcement agencies in defendant's hometown ("you've never dealt with us. You've dealt with everybody in Madera"); and telling defendant, "I feel offended that you don't believe me."

Detective Chavez was gone for approximately five and a half minutes before he returned and said, "[H]e didn't answer." Following a rambling narrative in which he claimed his "buddy" might get a hold of the sergeant "at any minute," the detective recited the *Miranda* warnings. Next, Detective Chavez told him, "[T]he fastest way to get home … [i]s to be completely honest." Approximately one minute later, defendant said, "Um, just try to help me out sir." He then began detailing exactly what happened in Dos Palos. Given the timing and sequence of events, all reasonable inferences suggest defendant's hope of the sergeant authorizing his release motivated his decision to waive the right to remain silent and further incriminate himself.

The People argue defendant's decision to confess was based on a brief discussion about what would happen if he got "locked up" and the concern about his statements not being "on paper." This argument refers to the period in between the *Miranda* warnings and the start of defendant's confession. We are not persuaded.

Following Detective Chavez's "fastest way to get home" statement, he and defendant spoke for approximately 15 seconds about whether the conversation would be "on paper." Defendant's concern over his cooperation being documented was also discussed during the pre-*Miranda* interrogation. Detective Chavez had previously made equivocal statements on the subject, but this time he lied and told defendant his statements would not be "on paper."

Defendant knew Detective Chavez had evidence of his involvement in the robbery. That is why he said, "You know a lot" a few minutes prior to breaking down and saying, "Take me to jail." There is little to suggest defendant doubted he would

31.

eventually be charged even if the sergeant authorized his release. He at one point asked, "How much time do you think I'll do?" However, after being led to believe he might still "go home" that day if Detective Chavez told his sergeant about his truthfulness and cooperation, it appears defendant engaged in risk/reward analysis.

In other words, from defendant's perspective, remaining silent would almost certainly result in going straight to jail but providing further information might earn him a little extra time with his family. Taking a chance on going home carried the risk of his cooperation being documented, thereby exposing him to retribution from his accomplices (and, perhaps of equal or greater concern, by his own gang if he were perceived as a snitch). If anything, Detective Chavez lying about his statements not being "on paper" strengthens defendant's causation argument. "'While the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary [citation], such deception is a factor which weighs against a finding of voluntariness.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 934, quoting *People v. Hogan* (1982) 31 Cal.3d 815, 840–841.)

A separate discussion regarding protocols at the Merced County jail lasted approximately 23 seconds. Defendant sought to verify he would "go to the module" if he were sent to jail. Detective Chavez seemed unfamiliar with this terminology until defendant said, "With my homies." The detective then said, "Yeah, … we're not gonna put you in just in the GP or general—whatever they call it in Madera."[4] The People unconvincingly argue defendant was negotiating "conditions" for giving a confession and chose to waive his rights only because Detective Chavez agreed to those conditions.

---

[4]The written transcript says, "Well, my own" instead of "With my homies." Either way, the People appear not to realize this was a conversation about segregated housing for gang members. They suggest it was a discussion about placing defendant in some type of isolated protective custody. In any event, our analysis would be the same even if the transcript were accurate.

32.

There was no negotiation over the jail procedures. Defendant wanted to confirm what he already assumed to be true, i.e., that "if" he got "locked up" he would "go to the module."

The People also claim Detective Chavez "truly may have thought that his sergeant could authorize [defendant's] release depending upon his level of involvement in the crimes, especially if [defendant] had been pressured to commit them." This hypothetical circumstance is both farfetched and irrelevant. (See *People v. Vasila*, *supra*, 38 Cal.App.4th at pp. 875–876 [rejecting the argument "that officers are permitted to induce a confession by making promises, so long as they keep them"].) The decision to confess "must be entirely self-motivated." (*People v. Denney* (1984) 152 Cal.App.3d 530, 544; accord, *People v. Tully*, *supra*, 54 Cal.4th at p. 985.)

Lastly, the People contend defendant realized he was going to jail and therefore could not have been relying on Detective Chavez's actions when he made the decision to confess. This argument is refuted by the record. Even after confessing to his role in the crime and stating the assumption he would be "getting lock up," defendant continued to ask about going home. He said, "Is there a possible way I can go home?" "What do you think your sarge is gonna say?"

The following exchange took place during the last five minutes of the interrogation:

> "A: Please, sir.

> "Q: I'm gonna go make—I'm gonna go see.

> "A: I wanna go home, sir. Please, let me go home, sir.

> "Q: I'm looking you right in the eye, man. I'm gonna—I'm gonna go see, but just like I told you from the beginning, I'm not making any promises. I don't wanna be a liar, right? I just wanna know more about this Tony guy.

> "A: That's all I know.

> "Q: Would you tell me where he lives?

> "A: No. Yeah, uh, I—I wanna go home, sir.

"Q. Yeah.

"A: I—I told you what I did 'cause I want—I mean, I need to go home. I'll change my life, man. That's what I'm trying to do for my baby boy—or baby girl, I mean.

"Q: Okay. All right."

The statement, "I told you what I did 'cause I want—I mean, I need to go home" is probative of what motivated defendant to waive his right to remain silent. It supports all other inferences drawn from the totality of the circumstances: Detective Chavez's express and implied promises to advocate for defendant's release, and those regarding the possibility of the sergeant allowing him to go home based on his cooperation and truthfulness, were a motivating cause of defendant's decision to confess. Therefore, the confession was involuntary as a matter of law and should not have been admitted at trial.

## D.     Prejudice

Again, the erroneous admission of defendant's custodial statements is evaluated under the *Chapman* standard. (*People v. Case*, *supra*, 5 Cal.5th at p. 22.) It is the People's burden to establish "beyond a reasonable doubt that the error … did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.) "'To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Neal*, *supra*, 31 Cal.4th at p. 86.)

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296; accord, *People v. Cahill* (1993) 5 Cal.4th 478, 503 ["confessions often operate 'as a kind of evidentiary bombshell which shatters the defense'"].) "While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may

34.

tempt the jury to rely upon that evidence alone in reaching its decision." (*Fulminante*, *supra*, at p. 296.)

"[A]lthough the erroneous admission of a confession might be harmless in a particular case, it nevertheless is 'likely to be prejudicial in many cases.'" (*People v. Neal*, *supra*, 31 Cal.4th at p. 86.) As a practical matter, especially strong evidence of guilt is necessary to demonstrate the absence of prejudice. (See *People v. Cahill*, *supra*, 5 Cal.4th at pp. 503–505.) "The erroneous admission of an involuntary confession properly might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime [citation]." (*Id.* at p. 505.)

Without defendant's custodial statements, the People's case was entirely dependent upon the victim's testimony. Although fingerprint evidence reportedly existed to connect defendant to the crime scene, no such evidence was introduced at trial. The People argue the same outcome was inevitable because the victim identified defendant in court and gave testimony satisfying each element of the charged crimes. This argument downplays the importance of the confession evidence, particularly with respect to the charge of aggravated kidnapping.

Under the prosecutor's theory of kidnapping for ransom, seizure of the victim's baby was a necessary finding. Defendant was alleged to have seized the baby by picking it up. In his post-*Miranda* confession, defendant specifically admitted to picking up the baby. During closing argument, the prosecutor reminded the jury of defendant's admission.

The victim's testimony was consistent with certain parts of defendant's confession, but it also contradicted her initial reporting of the incident. At trial, the

35.

victim claimed her baby had been crawling on the floor when the intruders entered. Defendant restrained the victim, threw her to the ground, and left her lying there while he and the female intruder ransacked the home. The victim testified defendant later "hugged" the baby immediately before or after repeating demands about the box of money he was trying to find. When she denied having any such box, defendant placed the child back on the floor. In this version of events, the baby remained approximately three feet away from the victim throughout the robbery, including while it was being held by defendant.

According to the investigating deputies, the victim initially reported "that while on the floor," with her hands tied in front of her, "she reached over to a walker in which her baby was seated" and grabbed the baby. She then held the baby "between her arms and chest" "for the duration of the ordeal," which lasted approximately "half an hour." The victim also initially accused defendant of threatening to stab her, but the People stipulated that she had retracted the allegation.

The jury deliberated for over two hours before submitting a written request: "Victim statement regarding when he hugged the baby and what did defendant say to her. [¶] 'Would like to request entire statement from mother.'" Approximately 45 minutes later, the trial court told the parties, "I understand that the jury is having some trouble reaching a verdict." During an ensuing discussion about how to proceed, a courtroom deputy advised that the jury had reached a decision on all counts. Given the victim's conflicting versions of events and the jury's scrutiny of her testimony, there is a likelihood the confession evidence contributed to the verdicts. (See *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["Juror questions and requests to have testimony reread are indications the deliberations were close"].)

Furthermore, a highly unusual incident occurred the day after the victim's trial testimony. The prosecutor informed the judge and defense counsel that the victim had admitted to knowingly providing false responses on cross-examination. Defense counsel

36.

had asked her if she had met with the prosecutor within the past week and/or ever previously met with certain representatives from the district attorney's office. The victim answered "no" to those questions despite being aware her testimony was untrue.

The prosecutor requested permission to recall the victim to the stand to address the issue. Defense counsel opposed the request, citing concerns the prosecutor would elicit testimony emphasizing the victim's fear of defendant and the effect of that fear on her actions in court. The trial court did not allow the victim to be recalled, but its ruling was conditioned on defense counsel refraining from any attempt to "paint[] her as a liar because of that." Counsel was warned: "To the extent that the defense uses that issue to call her a liar, I'll allow … the prosecution to reopen at any time." Defense counsel may very well have pursued a different strategy had his client's confession not been admitted into evidence.

The defense case was both constrained and shaped by the admission of defendant's custodial statements. Defendant relied on a theory of duress, which in light of the confession may have been his only viable strategy. The denial of his motions to suppress his statements foreclosed any dispute over the issue of identity.

In the victim's initial reporting of the crime and in her trial testimony, she claimed to have only seen the third intruder from behind. In other words, she only saw the faces of one man and one woman. According to the police reports and other parts of the record, the victim was shown photographic lineups containing images of defendant, Rubio, and S.L. She positively identified Rubio, reportedly saying "she recognized her because she was staring at her for a long [time] during the incident." (Capitalization omitted.) Interestingly enough, the victim *also positively identified S.L.* When shown the "six-pack" containing defendant's photograph, she pointed to his picture but "advised she didn't feel comfortable identifying him as a suspect … [and] felt more comfortable not making a final decision." (Capitalization omitted.) If not for the confession evidence, the defense undoubtedly would have challenged the victim's in-court identification of

defendant. (Cf. *People v. Neal*, *supra*, 31 Cal.4th at p. 87 [noting in reversible error analysis that "[w]ithout the confessions, defendant would not have been impelled to testify. He also would have had a substantial reason, and a strong incentive, to challenge the testimony of the [prosecution's expert witness]"].)

In summary, defendant's confession was an integral component of the People's case. For the reasons discussed, it is apparent the admission of his custodial statements was not a harmless error. Therefore, the judgment must be reversed.

## II.  Sufficiency of the Evidence

Defendant separately challenges his conviction of kidnapping for ransom. This claim is not mooted by the reversible error discussed above. "[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 34; accord, *People v. Eroshevich* (2014) 60 Cal.4th 583, 590–591.) There is no dispute over the sufficiency of the evidence supporting counts 2, 3, and 5. The question presented is whether defendant is subject to retrial on count 1.

The conduct proscribed by section 209, subdivision (a) (section 209(a)) is commonly referred to as kidnapping for ransom, reward, or extortion. (See, e.g., CALCRIM No. 1202.) This is somewhat of a misnomer, as is the more general label of aggravated kidnapping, because the statute can be violated without kidnapping someone. (See *People v. Greenberger* (1997) 58 Cal.App.4th 298, 368, fn. 56 ["Simple kidnapping is not a lesser and necessarily included offense to a violation of section 209, subdivision (a) since the latter can be accomplished without asportation and the former cannot"].) Kidnapping is one of several different ways to satisfy the actus reus of the offense.

Section 209(a) provides, in relevant part: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person

38.

for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony." The crime carries a mandatory punishment of life in prison. (*Ibid.*) Under aggravating circumstances, e.g., if the victim suffers bodily harm, the punishment is life without the possibility of parole. (*Ibid.*)

The prosecution's theory of the offense, as stated in closing argument, was simple: "[Defendant] kidnapped for ransom [the victim's baby]. He picked it up. He seized the baby. He held the baby and demanded money for the baby."

There is no dispute over whether the bare elements of section 209(a) were established at trial. Defendant's claim is based on *Martinez, supra*, 150 Cal.App.3d 579, which holds that section 209(a) does not apply to "multivictim robberies in which the movement or *restraint* of the purported kidnap victim is merely incidental to the commission of the robbery and does not substantially increase the risk of harm over and above that necessarily present in the crime of the robbery itself." (*Martinez*, at p. 595.) Whether *Martinez* applies to this case is a legal issue determined by our independent analysis. (See *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 860 [the application of decisional law is "scrutinized de novo"].) Under the substantial evidence standard, we review the record in the light most favorable to the judgment to determine the existence of "evidence that is reasonable, credible and of solid value" from which the jury could have found defendant guilty beyond a reasonable doubt. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

In *Martinez*, two men forcibly entered the home of a husband and wife. (*Martinez, supra*, 150 Cal.App.3d at p. 586.) The husband was taken into the living room and tied up. While one man stood guard over the husband, the other man went into a bedroom where the wife was located and told her "that if she screamed her husband would be hit or shot by [his accomplice]." The man took some items from the bedroom dresser and then sexually assaulted the wife. (*Ibid.*) Based on these facts, the

perpetrators were convicted of aggravated kidnapping in violation of section 209(a). (*Martinez*, at p. 587.)

The prosecution's theory in *Martinez* was seizure or confinement of one person for the purpose of exacting something of value from another person. (*Martinez*, *supra*, 150 Cal.App.3d at p. 587.) The wife's cooperation in the robbery was said to constitute "a valuable thing" within the meaning of section 209(a). By restraining the husband and threatening the wife "that he would be harmed if she screamed or interfered in the robbery," the perpetrators confined one victim to exact a valuable thing (cooperation) from the other victim. (*Martinez*, at p. 587.) "The prosecutor acknowledged that this theory of aggravated kidnaping would encompass all robberies in which the robber holds a gun on two persons and says to one of them that he will harm the other if his demand for money is refused." (*Ibid.*)

The *Martinez* appellants successfully argued that section 209(a) was not intended "to reach conduct that is essentially a multivictim robbery." (*Martinez*, *supra*, 150 Cal.App.3d at p. 587.) The Second Appellate District, Division Four, closely examined the history of the statute and case law interpreting its provisions. The historical background is essential to understanding the holding of *Martinez*, so much of the same information will be presented here.

"Prior to 1933, aggravated kidnaping as defined in section 209 required some movement of the victim; the statute proscribed taking or enticing away any person in order to commit robbery or extortion or to exact any valuable thing." (*Martinez*, *supra*, 150 Cal.App.3d at p. 588.) "In the 1920's, an alarming rate of kidnappings for ransom occurred, culminating in the infamous Lindbergh kidnapping. [Citation.] Congress responded by enacting the Federal Kidnapping Act, commonly called the Lindbergh Law, in 1932 …. One year later, the California Legislature amended section 209 to incorporate most of the language of the Lindbergh Law." (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1226, fn. omitted.)

Section 209 was amended twice in 1933.  (*People v. Nguyen* (2000) 22 Cal.4th 872, 882.)  As a result, "movement was no longer required; instead of taking or enticing away, the statute proscribed mere seizure or confinement with the intent to rob, extort, or exact a thing of value."  (*Martinez*, *supra*, 150 Cal.App.3d at p. 588.)  The amendments also "changed the crime of aggravated kidnapping to include, for the first time, the concept of harm to the victim, linking that concept to the severity of the penalty."  (*Nguyen*, *supra*, at p. 883.)  This was done in "recognition of the extreme danger inherent in kidnapping for ransom."  (*People v. Ordonez*, *supra*, 226 Cal.App.3d at p. 1226.)

In 1950, the California Supreme Court noted the 1933 amendments "effectively allowed all robberies involving the slightest detention to be prosecuted as aggravated kidnapings, but held that any doubts as to the wisdom of such a result must be addressed not to the courts but the Legislature."  (*Martinez*, *supra*, 150 Cal.App.3d at p. 588, citing *People v. Knowles* (1950) 35 Cal.2d 175.)  In 1951, the Legislature amended section 209 to require the element of asportation in all kidnappings done for the purpose of committing robbery.  "The definition of kidnap for ransom or extortion, however, remained essentially unchanged, still requiring no act beyond seizure or confinement."  (*Martinez*, at p. 588.)

"From 1951 to 1976 the courts treated kidnapping for ransom and kidnapping for robbery as separate offenses, even though both were housed in the same section of the Penal Code, because only kidnapping for robbery required asportation of the victim.  In 1976, as part of the determinate sentencing law, this construction was codified by designating kidnapping for ransom, extortion or reward as subdivision (a) of section 209, and kidnapping for robbery as subdivision (b), of that section."  (*People v. Ordonez*, *supra*, 226 Cal.App.3d at pp. 1226–1227.)  These distinctions remain in the current version of section 209, and there is still no asportation requirement under section 209(a).

At the time of *Martinez*, section 209(a) was understood to apply to four types of cases.  (*Martinez*, *supra*, 150 Cal.App.3d at pp. 588–589.)  In the "classic kidnap for

ransom situation," a kidnap victim is abducted from his or her home and held in seclusion while ransom is demanded from the victim's family. (*Ibid.*, citing *People v. Dacy* (1970) 5 Cal.App.3d 216.) Conversely, the kidnap victim may be detained at the point of seizure while the recipient of the ransom demand is taken elsewhere to obtain the money. (*Martinez*, *supra*, at p. 589, citing *People v. Macinnes* (1973) 30 Cal.App.3d 838.)

"*People v. Anderson* (1979) 97 Cal.App.3d 419, represents a third situation, in which neither the kidnap victim nor the recipient of the ransom-demand is moved. There the defendants entered a couple's home while the husband was away, held the wife there, and attempted to telephone the husband to demand ransom." (*Martinez*, *supra*, 150 Cal.App.3d at p. 589.) "A fourth situation was recognized in *Magee v. Superior Court* (1973) 34 Cal.App.3d 201[,] … [which] held that a kidnap for extortion may be shown by a defendant seizing a person and holding him hostage in order to induce police officers to refrain from resisting and stopping the defendant's criminal acts." (*Martinez*, *supra*, at p. 589.)

Based on its survey of post-1951 case law, the *Martinez* court concluded section 209 "was not intended to apply to the 'normal' robbery situation." (*Martinez*, *supra*, 150 Cal.App.3d at p. 591.) "[A]ccording to the kidnaping for ransom line" of authority, the statute "*is* intended to apply to those situations involving a primary and secondary victim, where one of the victims is held or taken away and the other is subjected to a ransom or extortion demand." (*Ibid.*) However, no case had ever held "that a kidnap for ransom or extortion is shown by detaining two people during a robbery and threatening one of them with harm to the other should cooperation be withheld." (*Id.* at p. 589.) In determining such a holding would be untenable, the *Martinez* court relied on *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*).)

The *Daniels* case involved charges of kidnapping for robbery. The perpetrators had committed a series of home invasion robberies in which the victims were moved "distances of 18 feet, 5 or 6 feet, and 30 feet respectively." (*Daniels*, *supra*, 71 Cal.2d at

42.

p. 1126.)  Under the version of section 209 then in effect, as well as under precedential authority, those slight movements established the asportation requirement.  (*Daniels*, at p. 1126.)  Nevertheless, the California Supreme Court "questioned whether the Legislature could have intended for the standard robbery situation to lead to a prosecution for aggravated kidnaping, or for prosecutors to have an unlimited option to charge either robbery or kidnaping for robbery."  (*Martinez*, *supra*, 150 Cal.App.3d at p. 590, citing *Daniels*, *supra*, at p. 1134, fn. 8.)  "The court concluded that it was not the Legislature's intent to allow the aggravated kidnaping statute to be used to prosecute normal robberies."  (*Martinez*, at p. 590.)

The *Daniels* opinion holds "that the intent of the Legislature in amending … section 209 in 1951 was to exclude from its reach not only 'standstill' robberies [citation] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself."  (*Daniels*, *supra*, 71 Cal.2d at p. 1139.)

As noted, section 209 did not contain separate provisions for kidnapping for ransom and kidnapping for robbery until 1976, more than six years after *Daniels* was decided.  Although *Daniels* involved kidnapping for robbery, which is now proscribed by section 209, subdivision (b), the *Martinez* court concluded "the *rationale* of *Daniels*" is equally applicable to section 209(a).  (*Martinez*, *supra*, 150 Cal.App.3d at p. 594.)  "The rationale, as opposed to the precise holding, was that this state's aggravated kidnaping statute should not be construed to apply to conduct which is no different or more culpable than that incident to lesser crimes."  (*Ibid.*)  The authorities cited and discussed in *Daniels*, which included cases from other jurisdictions, "had all argued that the scope of kidnaping statutes should not be so broad as to include conduct which is integral to other lesser crimes and which does not constitute 'kidnaping' in any reasonable sense of the word."  (*Martinez*, *supra*, at p. 590.)

43.

The *Martinez* court further reasoned "that the robbery statutes themselves contemplate the kidnaping for ransom theory of the present case as nothing more than a standard robbery situation." (*Martinez*, *supra*, 150 Cal.App.3d at p. 592.) Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The requisite "fear" may include "[t]he fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." (§ 212.) "It is hard to conceive a robbery accomplished by fear of injury to a companion unless the companion is seized or confined. Thus, the *Daniels* notion that standard robbery situations do not constitute kidnapings would seem to apply not only to single victim robberies, but also to those where one victim is confined while another is compelled to cooperate out of fear for him." (*Martinez*, *supra*, at p. 592.)

To summarize, *Martinez* holds "the *Daniels* rationale applies to situations where the victim of a robbery is placed in fear for his [or her] restrained companion, *if* the restraint is incident to the robbery and does not substantially increase the risk of harm beyond that inherent in the robbery itself." (*Martinez*, *supra*, 150 Cal.App.3d at p. 593.) "This application should not be defeated by the arbitrary device of charging such conduct as a kidnaping for ransom unless we are to revert to the discredited practice of allowing the difference between robbery and aggravated kidnaping to hinge solely on what crime the prosecutor happens to charge." (*Ibid.*) Accordingly, the holding is limited "to what is necessary to prevent the *Daniels* line of cases from being circumvented by charging what is essentially a multivictim robbery as a kidnaping for ransom." (*Id*. at p. 595.) As used in the opinion, "'multivictim robberies'" are "those robberies in which more than one person is subjected to force or fear, regardless of whether each such person is made the subject of a separate robbery count or not." (*Ibid.*)

One observation in *Martinez* bears repeating: "To date, no case has held that a kidnap for ransom or extortion is shown by detaining two people during a robbery and

44.

threatening one of them with harm to the other should cooperation be withheld." (*Martinez*, *supra*, 150 Cal.App.3d at p. 589.)  Although *Martinez* was decided 37 years ago, the quoted statement remains true today.  We agree with the holding of *Martinez* and conclude it applies to this case.  Defendant's seizure and detention of the victim's baby, coupled with his demand for a box of money, technically satisfies the elements of section 209(a).  However, under *Martinez*, the sufficiency of the evidence depends on whether his conduct was incidental to the commission of robbery and, if so, whether it substantially increased the risk of harm to the baby beyond the risks inherent in the robbery itself.  (*Martinez*, at pp. 591, 595–596.)

The People argue *Martinez* is distinguishable because defendant "did not threaten to *harm* the baby if [the victim] did not cooperate; instead, [defendant] threatened to *take* the baby if [the victim] did not give them the box of money."  The *Martinez* holding is not so narrow.  The opinion addresses scenarios in which "one of the robbery victims is expressly induced to cooperate out of fear for another."  (*Martinez*, *supra*, 150 Cal.App.3d at p. 593; see *id*. at p. 592 ["standard robbery situations do not constitute kidnapings … where one victim is confined while another is compelled to cooperate out of fear for him"].)

Even assuming defendant's threat to take the baby did not implicitly include a threat of harm to the baby, no reasonable juror could disagree it was intended to cause, *and did in fact cause*, the victim to fear for the safety of her child.  Immediately after testifying to what defendant had said, the victim was asked, "Were you afraid for the safety of your baby?"  She replied, "Yes."

The People further contend defendant's actions were not incidental to the robbery. They cite *People v. Chacon* (1995) 37 Cal.App.4th 52 and quote the following statement: "'If the ransom demand is made on a person other than the kidnap victim, there is no robbery.'"  (*Id*. at p. 63.)  While this language arguably provides superficial support for

the People's position, a close examination of *Chacon* reveals it to have little precedential value on this issue.

The *Chacon* appellants were California Youth Authority inmates who kidnapped a librarian during an attempted escape. (*People v. Chacon*, *supra*, 37 Cal.App.4th at p. 56.) They held the librarian hostage with a "shank" to her neck, threatening to kill her unless their demands for a truck (needed to accomplish the escape) were met. (*Id*. at p. 58.) The appellants were convicted of kidnapping for ransom and other crimes. In one of multiple arguments made on appeal, they claimed the demand for a truck was an act of robbery. The appellate court concluded no robbery had occurred, and it went on to say, "If the ransom demand is made on a person other than the kidnap victim, there is no robbery. The kidnapping for ransom statute applies '… to those situations involving a primary and secondary victim, where one of the victims is held or taken away and the other is subjected to a ransom or extortion demand.'" (*Id*. at p. 63, quoting *Martinez*, *supra*, 150 Cal.App.3d at p. 591.)

Since the *Chacon* quote is based on *Martinez*, we conclude *Chacon* does not support the People's argument. Furthermore, when read in context, the portion of *Martinez* cited by *Chacon* is fully supportive of defendant's argument.[5] (*People v. Chacon*, *supra*, 37 Cal.App.4th at p. 63; *Martinez*, *supra*, 150 Cal.App.3d at pp. 590– 591.) Also, unlike the facts of *Chacon*, a robbery indisputably did occur in this case. The jury convicted defendant of home invasion robbery as alleged in count 2.

---

[5]The relevant portion of *Martinez* reads: "First, according to *Daniels* and its progeny, the aggravated kidnaping statute, as amended in 1951, was not intended to apply to the 'normal' robbery situation. Second, according to the kidnaping for ransom line, the amended statute *is* intended to apply to those situations involving a primary and secondary victim, where one of the victims is held or taken away and the other is subjected to a ransom or extortion demand. The problem with the instant case is that, while it might technically fall within this second category, we do not think that the purported kidnap victim was subjected to any greater confinement or risk of harm than is incident to a 'normal' multivictim robbery. To hold this case to be an aggravated kidnaping would therefore seem to defeat the rationale of *Daniels* and to defy the ameliorative purpose of the 1951 amendment." (*Martinez*, *supra*, 150 Cal.App.3d at pp. 590– 591.)

All evidence, including the victim's testimony, indicates defendant restrained the victim as soon as he entered the home. The victim was then thrown or placed on the floor. Next, defendant began searching the home for a box of money. At a later point in time, defendant approached the victim and told her "that if [she] did not give him … the box of money, that he was going to take [her] baby away, and that's when he hugged [the baby]."

"[T]he crime of robbery begins with the commission of any of the defined elements and is completed when all of the remaining elements have been committed. It is a continuing offense that concludes not just when all the elements have been satisfied but when the robber reaches a place of relative safety." (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059.) Because defendant used force against the victim (and also instilled fear) before he began ransacking the house, the robbery was clearly in progress when he picked up the baby. His seizure of the baby involved the use of force, thus establishing this was a "multivictim robbery" as contemplated by *Martinez*. (*Martinez*, *supra*, 150 Cal.App.3d at p. 595 ["we mean those robberies in which more than one person is subjected to force or fear, regardless of whether each such person is made the subject of a separate robbery count"]; see *People v. Griffin* (2004) 33 Cal.4th 1015, 1025 ["resistance by the victim is not a required element of robbery" and "the degree of force utilized is immaterial"].) The victim also testified that the baby was "scared."

Defendant picked up the baby at or near the time he demanded to know the location of a box of money—the same box of money he had been trying to find while ransacking the home.[6] When the victim denied having a box of money, defendant placed the baby on the floor and continued his search. These facts compel the conclusion defendant's seizure and detention of the baby was incidental to his commission of robbery. The evidence cannot reasonably be construed otherwise.

---

[6]The victim's testimony on cross-examination indicated defendant had already asked her about the box earlier in the robbery.

As for the second part of the *Martinez* test, there is no evidence suggesting defendant's actions substantially increased the risk of harm to the baby beyond the risks inherent in the robbery itself. The People do not attempt to refute this point. Nevertheless, we note the baby was at all times approximately three feet away from the victim. Defendant essentially stood in place during the acts of seizure and detention. Asportation is not an element of section 209(a), but the fact the baby remained in the same place eliminates any theories of how taking it to another location might have created a more dangerous situation. The evidence shows defendant did nothing more than hold and "hug[]" the baby. His behavior was reprehensible, but it cannot be construed as substantially increasing the risk of harm beyond the risks inherent in the robbery itself.

Viewing the record on the light most favorable to the judgment, the evidence does not satisfy the *Martinez* test. Therefore, the evidence is insufficient as a matter of law to support a conviction under section 209(a). Count 1 must be reversed, and retrial of the charge is barred by double jeopardy. (*Burks v. United States* (1978) 437 U.S. 1, 18.)

## III. Alleged Instructional Error

Defendant alleges the trial court erred by refusing to give the CALCRIM No. 3403 instruction on necessity. "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.)

The remedy for an instructional error is reversal with the possibility of retrial. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 607 ["If reversal is predicated on instructional error, … double jeopardy principles do not come into play"].) Since the

48.

judgment is being reversed on other grounds, defendant's claim of instructional error is moot. (See *People v. Peoples* (2016) 62 Cal.4th 718, 773 ["A claim is moot when the grounds for the claim no longer exist"].) We thus decline to reach the merits of his argument.

## DISPOSITION

Defendant's conviction of aggravated kidnapping in violation of section 209, subdivision (a), is reversed for insufficient evidence. Accordingly, count 1 shall be dismissed and principles of double jeopardy bar retrial of the charge. The remainder of the judgment is reversed due to the erroneous admission of evidence of defendant's custodial statements. Defendant is subject to retrial on counts 2, 3, and 5.


PEÑA, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


DE SANTOS, J.